488 F.2d 127
 Jack MANNING and Clara Ann Manning, Plaintiffs-Appellees,
v.
ALTEC, INC., Defendant-Appellant.
Jack MANNING and Clara Ann Manning, Plaintiffs-Appellees,
v.
MOBILE AERIAL TOWERS, INC., Defendant-Appellant.
Jack MANNING and Clara Ann Manning, Plaintiffs-Appellants,
v.
MOBILE AERIAL TOWERS, INC., and Altec, Inc., Defendants-Appellees.
 Nos. 73-1219 to 73-1221.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 9, 1973.
Decided Dec. 5, 1973.
 
 William N. Groover, Knoxville, Tenn., for Altec, Inc.; Cheek, Taylor & Groover, Knoxville, Tenn., of counsel.
 George D. Montgomery, Knoxville, Tenn., for Mobile Aerial Towers, Inc.; Kennerly, Montgomery, Howard & Finley, Knoxville, Tenn., of counsel.
 W. Zane Daniel, Knoxville, Tenn., J. D. Lee, Madisonville, Tenn., for Jack Manning and Clara Ann Manning.
 Before WEICK, EDWARDS and LIVELY, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 A diversity action in the district court has resulted in three appeals which were consolidated and heard together in this court.[1] Jack Manning, an employee of the Knoxville Utility Board, was seriously injured while at work on July 1, 1970. At the time the injury occurred Manning was working in a bucket elevated above the ground by a crane or boom to which the bucket is attached, this equipment being commonly referred to as a "cherry picker." He and another lineman had been lifted in the bucket to a position near a group of electric wires from which they intended to remove a dead line. Manning's shoulder came into contact with an energized line and the resulting injury required that both hands and a portion of both arms be amputated. Clara Ann Manning joined in the complaint seeking damages for loss of consortium and services. The jury returned a verdict of $450,000 in favor of Jack Manning and $75,000 in favor of Clara Ann Manning. The district court, on its own motion, remitted $100,000 of the Jack Manning verdict and $45,000 of the Clara Ann Manning verdict and entered judgment for $350,000 and $30,000 respectively. The plaintiffs accepted these remittiturs under protest and have appealed in No. 73-1221.
 
 
 2
 The defendants in the action in the district court were the manufacturer, Mobile Aerial Towers, Inc. (Mobile) and Altec, Inc. (Altec), the distributor of the "cherry picker" equipment. It was stipulated that the equipment had been purchased by Manning's employer on July 1, 1966 and had been put in operation on July 27, 1966. At an informal pretrial conference held in chambers immediately before the jury trial began, attorneys for the plaintiffs stated that the case would be tried as a products liability action under Section 402A of the Restatement of Torts[2] and that the only negligence to be proven was that the equipment left the hands of the manufacturer with a defective servo valve. Although Jack Manning could remember nothing about the accident and there were no eye witnesses, his theory was that the bucket in which he was working tilted and this resulted in his body being thrown against the "hot" wire.
 
 The Liability Issue
 
 3
 Both defendants made motions for a directed verdict and for judgment notwithstanding the verdict, contending there was no evidence of negligence. Jack Manning and other employees of the Knoxville Utility Board testified that the bucket on the particular piece of equipment in question had tilted on previous occasions, beginning in the period one month to six weeks after the equipment was delivered to the employer and continuing to the morning of Manning's injury. A fellow worker who was on the ground testified as to Manning's position with respect to the energized wire immediately before the accident which he described as the normal position for the work he was doing and was permitted, on the basis of 17 years experience, to testify that in his opinion the injury was caused by a sudden movement of the bucket. Each side produced expert testimony on the function of the servo valve and the effect of a defective servo valve on the stability of the bucket. The expert for the plaintiffs characterized the servo valve as the heart of the system which keeps the bucket steady in a vertical position as the boom raises and lowers it. He stated that if the servo valve leaks the bucket would have a tendency to rock or tilt. In answer to a hypothetical question he said the only thing which could cause the unit to tilt would be a malfunction of the servo valve. Although there was testimony from the experts produced by the defendants which contradicted that of the plaintiffs' witness, this conflict only made a jury issue.
 
 
 4
 Altec further contended that it was entitled to a directed verdict because the servo valve was sealed inside of the equipment and it had no opportunity to inspect the valve and was really nothing more than a conduit between the manufacturer and the purchaser of the equipment. However, there was evidence that the servo valve was accessible for inspection and repair and that all that was required to inspect it was the simple removal of a small plate. The court was justified in refusing to treat the servo valve as a product in a sealed container. Cf. Walker v. Decora, Inc., 225 Tenn. 504, 471 S.W.2d 778 (1971). Mobile asserted that it should be relieved of liability because the servo valve had been overhauled and was not in substantially the same condition as when it left Mobile's hands. However, the evidence concerning repairs to the equipment was not sufficiently clear to justify this conclusion. An examination of all of the evidence in the case convinces us that the court correctly submitted the issue of liability to the jury. This was not a case where only one possible verdict could have been reached by a reasonable jury, and therefore it would have been improper to have granted a directed verdict or judgment notwithstanding the verdict. Reeves v. Power Tools, Inc., 474 F.2d 375 (6th Cir. 1973).
 
 
 5
 On appeal Altec complains that it was denied due process of law by the refusal of the trial judge to permit its counsel to cross-examine a witness produced by the co-defendant Mobile. The trial court ruled that the questions which counsel for Altec attempted to ask the witness were repetitive and stated that both defendants were in the same position in the case. Counsel for Altec did not challenge this ruling by the court and made no attempt to show that the witness would give different answers to his questions nor did he offer to the court an avowal concerning questions which he proposed to ask the witness and the answers he expected to receive. Any error by the trial court in this respect was waived by Altec. After the verdict was rendered Altec made a motion for judgment over against Mobile on the theory that it was entitled to indemnity for the full amount of the verdict under the evidence in this case. The court properly denied the motion since no cross-claim had been filed by Altec against Mobile.
 
 
 6
 Both defendants argued in the district court and in this court that Clara Ann Manning's cause of action for loss of consortium was barred by the applicable Tennessee statute of limitations. The right of a wife to recover damages for loss of consortium is created by statute in Tennessee. Tennessee Code Annotated (TCA) Sec. 25-109. The general statute of limitations for personal tort actions, TCA Sec. 28-304, has previously been construed to require the commencement of products liability actions within one year after the date of purchase of defective equipment rather than the date of injury. Jackson v. General Motors Corp., 223 Tenn. 12, 441 S.W.2d 482, cert. denied, 396 U.S. 942, 90 S.Ct. 376, 24 L.Ed.2d 243 (1969). As noted hereafter TCA Sec. 28-304 has been amended since this decision was rendered. A second statutory provision, TCA Sec. 50-914, provides that limitations do not begin to run in an employee's action for personal injuries against some person other than his employer until the date of the injury. This provision applies to the claim of Jack Manning. Dobbins v. Terrazzo Machine and Supply Co., Tenn., 479 S.W.2d 806 (1972). The district court held that Clara Ann Manning's claim for loss of consortium was derivative from Jack Manning's claim for personal injuries and that the same statute of limitations should apply to both claims. On April 4, 1972 the Tennessee General Assembly enacted an amendment to TCA Sec. 28-304 to provide that no person shall be deprived of his right to maintain an action in a products liability case until one year from the date of his injury. The history of legislative amendments of TCA Sec. 28-304 in response to Jackson v. General Motors Corp., supra, leads us to the conclusion that it would be against the public policy of Tennessee to hold that the right of action of Clara Ann Manning was barred by limitations because she did not file suit within one year after her husband's employer purchased the equipment even though she filed within one year after the date of his injury. Bradley v. General Motors Corp., 463 F.2d 239 (6th Cir. 1972). The district court correctly held that the action of Clara Ann Manning was timely filed.
 
 The Remittitur Issue
 
 7
 Although constitutional objections have been raised, it is now settled that a trial court which deems a jury's award of damages excessive may order the plaintiff to remit a portion of the verdict or suffer a new trial. Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935). In diversity cases from the district courts in Tennessee this court has approved the Tennessee practice of permitting a plaintiff to accept remittitur under protest and then appeal the trial court's ruling. Mooney v. Henderson Portion Pack Co., Inc., 334 F.2d 7 (6th Cir. 1964). In the second appeal of the Mooney case this court discussed the underlying rationale of the practice of remittitur, holding that it is ". . . ancillary to . . . [the] right of the trial judge to grant a new trial because of the excessiveness of the jury verdict." Mooney v. Henderson Portion Pack Co., Inc., 339 F.2d 64, 66 (6th Cir. 1964). Since the action of a trial court in granting a new trial on the ground that a verdict is excessive is subject to review only for abuse of discretion, the same standard is applied to an order of remittitur. In order to determine whether there has been an abuse of discretion it is necessary to examine the evidence on damages and the considerations which led the trial judge to order remission of a portion of the verdict.
 
 
 8
 It is undisputed that Jack Manning is totally and permanently disabled. At the time of the accident he was 39 years old, in good health and had been employed as a journeyman lineman for approximately 20 years. His earnings for the three years immediately preceding the accident and for the first half of 1970 were as follows:
 
 
 9
 1967 ................ $8,785.47
1968 ................. 9,531.63
1969 ................. 9,954.11
Jan.-June 30, 1970 .. 5,512.14.
 
 
 10
 The mortality tables in the Tennessee Statutes which were admitted and upon which a proper instruction was given, indicated a life expectancy for a person 41 years of age (his age at the time of trial) of 31.29 years. In addition to lost future wages, a loss of earnings in the amount of $21,750 was shown between the date of the accident and the trial. Medical expenses of $22,570.27 were proven and the undisputed testimony of a manufacturer of prosthetic devices was that Jack Manning will be required to expend $24,500 for artificial limbs during the remainder of his life.
 
 
 11
 The plaintiff spent 56 days in a hospital in Knoxville and 90 days at specialized medical facilities in New Jersey. Although the stumps of his arms healed well, Manning has complained of recurring phantom arm pain which has required medical treatment. It was shown that Manning had built the home in which he and his family lived with very little outside help and possessed skills which enabled him to maintain his property. It has been his practice to work in his spare time around the house and at the church where he was active. Although he had achieved some proficiency with artificial limbs at the time of the trial, which was more than two years after the injury, he was still unable to care for himself. It was necessary that his wife brush his teeth, comb his hair, and shave him and assist him in dressing and at the table. He was unable to care for himself in the bathroom and needed the aid of his wife there. Because of his severe incapacity, Manning felt that he and his wife should not have any more children and a bilateral vasectomy was performed to sterilize him.
 
 
 12
 The very sparse evidence on Mrs. Manning's claim for loss of consortium and services is set forth in full:
 
 
 13
 Q What has been his health over the years, has he been a good healthy person?
 
 
 14
 A Yes.
 
 
 15
 Q And over the years has he been healthy and working around the house as much as can be expected of him?
 
 
 16
 A Yes. He has done everything around the house. He built the house we live in and he has taken care of everything that is needed to be taken care of around the house. And also he has done my mother's work and built her house. My father is deceased.
 
 
 17
 Q When you say he built the house, does that mean the carpentry work and masonry work?
 
 
 18
 A All the carpentry work and he mixed cement for the brick mason and he helped the plumbers.
 
 
 19
 Q So he did have some help but pretty much he did a lot of it himself?
 
 
 20
 A Yes.Q Now in addition to his work there has he performed work and helped out on other jobs or helped other people around?
 
 
 21
 A Yes. He, like I say, worked for my mother and he does a lot of work in church, anything needs to be done.
 
 
 22
 Q Has he been a very active person over the years?
 
 
 23
 A Yes.
 
 
 24
 In his Memorandum filed in response to the various posttrial motions of the defendants, the trial judge set forth his reasons for granting remittitur as follows:
 
 
 25
 Another difficulty is that these verdicts are substantially higher than those rendered in similar actions under similar circumstances in recent years. Mr. Manning proved medical expenses and lost wages of approximately $69,000.00. Assuming that he continued to earn at the rate of $11,000.00 per year and retired at age sixty-five, the value of his future earnings, capitalized at 6%, is approximately $199,000.00. Thus, his total proven economic loss is around $268,000.00.
 
 
 26
 Proof of damages is lacking in Mrs. Manning's action for loss of consortium. Consortium has been defined as:
 
 
 27
 ". . . the conjugal fellowship of husband and wife, and the right of each to the company, cooperation, affection and aid of the other in every conjugal relation."
 
 
 28
 We charged the jury in this case as to that definition and further charged them that loss of consortium is a right of action separate from that of the husband for his damages, that loss of services is a part of the loss of consortium, and that both loss of services and loss of consortium must be proven by the wife.
 
 
 29
 It is to be observed from this definition that there are two main elements of damage in this cause of action. First is the loss of conjugal relations. Mrs. Manning experienced this loss for the few weeks Mr. Manning was in the hospital and, perhaps, for a comparatively short time thereafter. These relations were resumed some time ago, and Mr. Manning underwent a vasectomy. The damages from this loss are not great. The second element of damage is loss of services. There is evidence in the record that Mr. Manning did the usual things husbands are expected to do, namely, mow the grass, wash the dishes and sweep the floors. As the Court recalls there is no proof in the record to show the value of these services in monetary terms. This value could not be large, and, in no case, could it be said to amount to $75,000.00. Joint Appendix, pp. 10a-11a.
 
 
 30
 If the calculations by the trial judge of direct economic loss were correct, the reduced verdict would include damages for physical pain and mental anguish of $82,000.
 
 
 31
 No universally accepted standard has been found for testing the application of remittitur. In Gorsalitz v. Olin Matheson Chemical Corp., 456 F.2d 180 (5th Cir.), cert. denied, 407 U.S. 921, 92 S. Ct. 2463, 32 L.Ed.2d 807, rehearing denied, 409 U.S. 899, 93 S.Ct. 108, 34 L. Ed.2d 159 (1972), the court held that the correct standard for determining excessiveness of a verdict is ". . . the amount which, under the evidence in the case, was the maximum that the jury reasonably could find to be compensatory for appellant's loss." Id. at 181. In the opinion Judge Godbold referred to the job of applying this rule in a personal injury case in which there are pain, suffering, and disfigurement as a "Solomonic task." Of course, this task first falls upon the jury and becomes a responsibility of the judge only if the jury fails to stay within limits drawn by the evidence in the case.
 
 
 32
 The District of Columbia Circuit follows the same rule which obtains in this circuit that the granting of a motion for a new trial based on excessiveness of the jury's verdict is reviewable only for abuse of discretion. In Taylor v. Washington Terminal Company, 113 U.S. App.D.C. 110, 409 F.2d 145, cert. denied, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969), a case involving remittitur, the court made the following observation, with which we agree:
 
 
 33
 Where the jury finds a particular quantum of damages and the trial judge refuses to disturb its finding on the motion for a new trial, the two factors press in the same direction, and an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial. However, where, as here, the jury as primary fact-finder fixes a quantum, and the trial judge indicates his view that it is excessive by granting a remittitur, the two factors oppose each other. The judge's unique opportunity to consider the evidence in the living courtroom context must be respected. But against his judgment we must consider that the agency to whom the Constitution allocates the fact-finding function in the first instance-the jury-has evaluated the facts differently. Id. at 148.
 
 
 34
 The test adopted by the court is that it will ". . . reverse the grant of a new trial for excessive verdict only where the quantum of damages found by the jury was clearly within 'the maximum limit of a reasonable range."' (emphasis in original). Id. at 149.
 
 
 35
 In view of the nature and extent of Jack Manning's injuries and the substantial direct economic loss which he suffered as a direct consequence of his injuries, we believe that the jury's award of $450,000 was clearly within the "maximum limit of a reasonable range" of compensation for his loss. Accordingly, it was an abuse of discretion to direct the remittitur of $100,000 of the damages awarded him. There was no direct evidence of the value of the loss of consortium and services claimed by Clara Ann Manning and the verdict of the jury was based solely on inferences to be drawn from the facts in evidence concerning her husband's injuries. We believe that the trial judge's view that this verdict is outside the maximum range deserves greater deference than the verdict of the jury under the particular circumstances of this case. Accordingly, we find no abuse of discretion in the action of the trial court in granting a remittitur of $45,000 of the damages awarded Mrs. Manning.
 
 
 36
 The judgment of the district court in Nos. 73-1219 and 73-1220 is affirmed. In No. 73-1221 the judgment of the district court is affirmed with respect to the appeal of Clara Ann Manning and reversed and remanded with respect to the appeal of Jack Manning with directions to restore the verdict in favor of Jack Manning to the amount awarded by the jury. Costs will be taxed to the defendants.
 
 
 
 [1]
 The district court's opinion is reported at 359 F.Supp. 211 (E.D.Tenn.1972)
 
 
 [2]
 Sec. 402A. Special Liability of the Seller of Product for Physical Harm to User or Consumer
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.