**Thomas M. BREWER, Plaintiff-Appellant,**

v.

**UNIROYAL, INC., et al., Defendants-Appellees and Cross-Appellants.**

**Nos. 73–1944, 73–1945.**

United States Court of Appeals, Sixth Circuit.

Argued April 11, 1974.

Decided June 28, 1974.

Phillip L. Brooke, Memphis, Tenn., for defendants-appellants, cross-appellees; John C. Scott, Rowley & Scott, Washington, D. C., on brief.

Thomas F. Johnston, Memphis, Tenn., for plaintiff-appellee, cross-appellant; Lawrence A. Pivnick, Memphis, Tenn., on brief.

Before PHILLIPS, Chief Judge, and CELEBREZZE and MILLER, Circuit Judges.

PER CURIAM.

Appellant was awarded a jury verdict of $32,080 in the District Court in an action for treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15. He alleged a violation of § 2 of the Robinson-Patman Act, 15 U.S.C. § 13, in that Uniroyal had discriminated in the pricing of tires which it had sold to him. In October 1968, Appellant signed a dealer franchise agreement with Uniroyal, and in November 1968 he opened an automobile tire business in Memphis, Tennessee.

Subsequently, Uniroyal entered into an arrangement with Harold Friend, under which Friend was to open Uniroyal wholesale-retail outlets in various cities, beginning in Memphis. The Memphis

outlet, known as United Tire & Rubber Co. (United), was opened in August 1969, with Friend owning and operating it through his firm, Tire Management Consultants, Inc., of Phoenix, Arizona.

In October 1969, Uniroyal purchased the United outlet. Friend and his former associates continued to operate United, and a Uniroyal employee was brought in to learn the operation. In March 1970, Uniroyal terminated its dealings with Friend and took over direct operation of the United outlet, continuing to operate it under the name United.

All tires sold by both United and Appellant were manufactured by Uniroyal outside Tennessee and shipped into the state. Appellant ordered his tires through the local Uniroyal warehouse or through Atlanta, while United dealt directly with the Uniroyal home office in New York City and received tire shipments directly from various Uniroyal factories. Both Appellant and United were authorized to do business throughout the Memphis area. United was situated approximately six miles from Brewer's location and made sales throughout the city. Both United and Appellant were authorized to solicit all types of tire business—wholesale, commercial and retail.

Appellant alleged that he learned of the United operation in August 1969, when he discovered that Uniroyal tires were being retailed and wholesaled in Memphis at prices equal to or less than those Brewer had to pay Uniroyal for tires of the same grade and quality. He contended that the prices at which Uniroyal billed United were lower in all categories of tires than the prices billed to him and that he was unsuccessful in his repeated attempts to secure Uniroyal tires at prices that would enable him to sell competitively with United. He also alleged that when he attempted to buy some tires at United, Uniroyal learned of this attempt, and an agreement was reached between Friend's personnel and the local Uniroyal sales manager that United would not sell to Brewer. At trial Uniroyal witnesses testified that some of the price differences must have occurred because United was receiving blemished tires or "blems," even when "blem" designations did not appear on the invoices. Appellant contended that even if all tires received or resold by United as "blems" were indeed blemished tires, Uniroyal discriminated against Appellant even in its pricing of "blems," because United received all maximum discounts plus another 50% off on "blems" while Appellant received only the maximum discounts plus 25% off. Appellant also alleged discrimination in the amount of reimbursement for advertising material. Another feature of the agreement between Uniroyal and Friend was that a consulting fee would be paid for Friend's assistance in opening outlets. Payments on this consulting fee totalled $57,000.00, commencing in July 1969, prior to Uniroyal's purchase of United. When Uniroyal purchased United, it also compensated Friend for his operating expenses from the time he opened the Memphis outlet in August 1969 and for certain travel expenses.

Appellant contended that his business had been progressing steadily into the summer of 1969, but then suffered a marked reverse after the United operation entered the Memphis market in August of that year. Attempting to meet this new competition, Appellant cut his prices drastically, actually increasing his volume for a short time, but suffering a severe decline in profits. Eventually, after sustaining continued losses, Appellant closed his business in June 1970.

Following the jury's verdict for Appellant, the District Court determined that there could be no recovery by Appellant for the period after October 11, 1969, the date on which Uniroyal purchased United. This determination was based on the jury's answers to special interrogatories that, from October 11, 1969, Uniroyal owned and effectively controlled United "in the day-to-day operations of its business, including the pricing of tires delivered to and sold by"

United. The jury also answered in the affirmative the question:

At any time when and if United Tire & Rubber Company was not under the actual ownership and effective control of defendant Uniroyal, were there substantial or consequential distinctions or differences in prices for same or similar tires charged by defendant Uniroyal between plaintiff Brewer Tire Company and United Tire & Rubber Company?

The District Court determined that no damages could be awarded for discriminatory pricing since there was only a two-month period prior to October 11, 1969 in which Appellant was operating his business and he had sustained an operating loss initially projected for that period. Finding that the only remaining evidence of discrimination during the pre-October 11 period related to consulting fees and travel expenses, and attempting to reconcile the jury's responses to the interrogatories, the District Court remitted the award of damages to $10,000.

Initially, the parties agree, and we hold, that the District Court must offer the party awarded damages the choice of a new trial or the amount of the Court's remittitur. Dimick v. Schiedt, 293 U.S. 474, 476, 55 S.Ct. 296, 79 L.Ed. 603 (1935); Kennon v. Gilmer, 131 U.S. 22, 29, 9 S.Ct. 696, 33 L.Ed. 110 (1889); Manning v. Altec, Inc., 488 F.2d 127, 130 (6th Cir. 1973). The District Court cannot, without the consent of the parties, substitute its judgment for that of the jury on the issue of just compensation. United States v. 93.970 Acres of Land, 258 F.2d 17, 31 (7th Cir. 1958), rev'd on other grounds, 360 U.S. 328, 79 S.Ct. 1193, 3 L.Ed.2d 1275 (1959). To permit the Court to do so would erode the parties' Seventh Amendment guarantee of a jury trial.

While the parties agree on this point, Uniroyal contends that it is not subject to liability under the Robinson-Patman Act because United is not a purchaser within the meaning of § 2(a) of the Act or a customer within the meaning of § 2(d).[1] These questions

---

1. § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: *Provided, however*, That the

Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and establsihed; *And provided further*, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further*, That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

are identical, as it has been held that the term "customer" in § 2(d) is synonymous with the term "purchaser" in § 2(a). American News Co. v. FTC, 300 F.2d 104 (2d Cir. 1962), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64. In opposing Uniroyal's argument, Appellant relies on Danko v. Shell Oil Co., 115 F.Supp. 886 (E.D.N.Y.1953), for the theory that a wholly-owned subsidiary can be considered an entity separate from its parent and thus be considered a purchaser or customer for purposes of the Robinson-Patman Act.[2] However, since the jury awarded damages for a period during which Uniroyal did not control the day-to-day operations of United and Appellant merely seeks reinstatement of the jury's verdict, we need not address ourselves to this question.

The jury found that there were substantial price differences for the same

or similar tires during the time when Uniroyal did not control United. And the jury found that Uniroyal paid or granted to United certain compensation, other than consulting fees for actual services rendered, not available to Appellant on similar terms; that the discrimination was for the purpose of lessening competition; and that Appellant suffered damages as the proximate result of Uniroyal's unlawful discriminatory conduct.

■ We recently considered the standard for reviewing a District Court's remittitur of a jury's award of damages. Manning v. Altec, Inc., 488 F.2d 127 (6th Cir. 1973). We held that a grant of a new trial for excessive damages or the use of a remittitur will be reversed only "where the quantum of damages found by the jury was *clearly* within 'the maximum limit of a reason-

---

§ 2(d), 15 U.S.C. § 13(d) provides:

It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

2. This theory has its basis in the holdings of Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), and Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951), that substance is to govern over form under the antitrust laws. In *Danko, supra,* the Court considered the existence of a competitive relationship to be the controlling factor. We agree that a sales subsidiary could be found to be independent of its parent and thus be considered a "purchaser" or "customer" under the Act. Reines Distributors, Inc. v. Admiral Corp., 257 F.Supp. 619, 621 (S.D. N.Y.1965). But it has been held that in determining whether a seller-purchaser relationship exists, the critical factor is the exercise of domain and control over the sub-

sidiary by the parent, not the competitive relationship. Reines Distributors, Inc. v. Admiral Corp., 256 F.Supp. 581 (S.D.N.Y. 1966); Baim & Blank, Inc. v. Philco Corp., 148 F.Supp. 541 (E.D.N.Y.1957). This standard is used in determining whether a parent and its subsidiary are a single entity and can be considered a single seller under the Robinson-Patman Act, Baim & Black, Inc. v. Philco Corp., 148 F.Supp. 541 (E.D. N.Y.1957), and in determining whether a buyer from a distributor is an "indirect purchaser" from the supplier of the distributor. Purolator Products, Inc. v. F. T. C., 352 F. 2d 874 (7th Cir. 1965), cert. denied 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837; see J. von Kalinowski, 3 Antitrust Laws and Trade Regulation §§ 24.03 and 24.04; F. Rowe, Price Discrimination Under the Robinson-Patman Act 53–59 (1962) & Supp. 7–8 (1964). Thus, the courts which have ruled on the question have found it appropriate that the same standard be applied to determine whether a sales subsidiary can be deemed a purchaser from its parent. *See* J. von Kalinowski, *supra,* § 24.04 [2]–[3]. There appears to be general agreement that there can be no sale under the Act unless the parties deal at arm's length, Reines Distributors, Inc. v. Admiral Corp., 256 F.Supp. 581, 585–586 (S.D.N.Y.1966), and authorities cited therein, although the argument has been advanced that the realistic effect on competition, rather than the question of control, should be the standard. *Id.* In view of our holding, however, we need not decide this question.

able range.' " *Id.* at 133, quoting from Taylor v. Washington Terminal Co., 133 U.S.App.D.C. 110, 409 F.2d 145, 149, cert. denied, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969). (Emphasis in original).

■ The statement of the rule is, of course, easier than its application. In looking to the facts of this case, we find that the jury awarded a total of $32,080 in damages—$24,630 for operating losses or loss of net operating profits and $7,450 for loss of investment and capital. Originally, Appellant testified that his damages were: (1) $10,104.35 capital investment, including $2,200 for personal automobile; (2) $6,798 total operation loss for the period he was in business; (3) $10,000 liquidation loss, including loss of goodwill; (4) $27,000 for loss of future profits; (5) $24,000 for cost of breaking his lease; (6) $54,000 paid to Friend as consultant fees; (7) $182,000 for loss of business for period when business closed until Appellant reached retirement age. Appellant later testified that his capital investment was $5,226 and his total operation loss was $4,344. The jury awarded no damages for future net profits. This would seem to include items (4) and (7) above.

The figures given were for Appellant's entire period of operation. Appellant was in business for a period of approximately twenty months (November 1968 to June 1970). United began its operation in August 1969 and was purchased by Uniroyal in October 1969. Thus, Appellant and United were in business simultaneously for a period of approximately ten months (August 1969 to June 1970). The pre-October 11, period, then, represented twenty to thirty percent (2–3 months) of the total ten month period. Additionally, the payments made to Friend were made retroactive to July 1969.

In its answer to the interrogatories, the jury apportioned its award of $24,630 for loss of net operating profit and operating losses, $14,630 for rent, insurance and taxes, and $10,000 for profit loss.

Upon review, we find that the jury's award of $32,080 was clearly within the "maximum limit of a reasonable range" of damages for the period of time involved. The amount of fees paid to Friend was substantial and the jury could well have found that this discriminatory payment caused Appellant the amount of damages awarded. Accordingly, we reverse the order of the District Court remitting the jury's award and remand to the District Court with instructions to reinstate the jury's original award.