**Margaret P. KATCH, as Independent Personal Representative of the Estate of Richard P. Katch, Deceased, Plaintiff-Appellee,**

v.

**SPEIDEL, DIVISION OF TEXTRON, INC., Defendant-Appellant.**

No. 83–1008.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 16, 1984.

Decided Oct. 17, 1984.

Eugene Driker (argued), Barris, Sott, Denn & Driker, Barbara Harvey, Detroit, Mich., Jack D. Radcliffe, Jr., Dykema, Gossett, Spencer, Goodnow & Trigg, Jackson, Mich., for defendant-appellant.

John W. Mason, Dearborn, Mich., Mark W. McInerney (argued), Phillip E. Chaffee, Fischer, Franklin, Ford, Simon & Hogg, Detroit, Mich., for plaintiff-appellee.

Before JONES and WELLFORD, Circuit Judges, and UNTHANK, District Judge.*

WELLFORD, Circuit Judge.

This is a diversity action brought by Richard P. Katch ("Katch") against his former employer, Speidel Division of Textron, Inc. ("Speidel"), arising from Speidel's termination of Katch's employment in May, 1980. Katch claimed that Speidel, by its written personnel policies and by various oral statements to him, had created and then breached a number of contractual obligations to him, most important of which was the obligation not to discharge him without just cause. Speidel denied these claims, and now seeks review of an adverse jury verdict in the amount of $1,534,000 as damages for breach of contract, which was reduced, by means of remittitur, to $1,190,-789 by the trial court.

Katch was a longtime employee of a Speidel distributor, with background in sales and management. While serving as operations manager of a distributorship in Michigan, he was approached by Speidel's then vice-president of Marketing and Sales, Mr. Keller, concerning Katch's becoming general manager of a Speidel distributorship in Cincinnati. After a series of discussions with Keller, plaintiff took the job and moved his family to Ohio, assuming his duties on August 1, 1978.

It soon became apparent that Speidel would not expand the Ohio operations to the extent originally planned. Talk centered on merging the Cincinnati operations with the Detroit operations of defendant company. Katch agreed that this would be a wise move, and he testified that Keller, who did not have the ultimate authority, allegedly promised plaintiff that he would be, in due course, named general manager of the consolidated operations at Detroit. Based on this discussion with Keller, Katch signed a purchase agreement to have a home constructed in the Detroit area. Despite the fact that changes had not yet

---

* The Honorable G. Wix Unthank, United States District Judge for the Eastern District of Kentucky, sitting by designation.

taken place as contemplated, Katch moved his family to Detroit so that his children could begin the school year there. He continued to work in Cincinnati, however, and commuted to Detroit on the weekends.

The warehousing and distribution functions of the Ohio and Michigan operations were finally consolidated in December of 1979; Katch was told by Speidel's president, Mr. Massotti, to locate a sales office in Cincinnati, not in Detroit as expected by Katch, who thereafter obtained a Cincinnati sales office in late January of 1980. A short time later, Massotti telephoned Katch and told him that he would be remaining in Cincinnati. By this time, however, plaintiff was in possession of a revised budget forecast indicating that the Cincinnati sales office might not exist past July of 1980. He then requested a meeting with Massotti to discuss his situation, and they met in mid-February of 1980. They agreed that plaintiff would work out of Detroit on Mondays and Fridays and out of Cincinnati on Tuesdays, Wednesdays and Thursdays.

During the next weeks, Katch was requested, but refused, to sign several documents which were entitled "employment agreements," but which would more accurately be labelled "termination agreements."

In mid-April, the position of general manager of Speidel's consolidated Detroit operations became open. Katch was not considered for the position, which was awarded to Lee Hill, whose overall job performance ranking and seniority was lower than plaintiff's. Hill, however, did have a better knowledge of some of the larger accounts served by the consolidated operation. On May 2, Katch was informed that he was being terminated as of one week later. At trial, Katch testified that his salary at the time of termination was $36,300. Based upon his experiences with Speidel, Katch testified that he would have expected to receive annual merit raises of 6.4% and an annual bonus of 21% of his salary, had he continued with Speidel until age 65. He also testified that he expected to receive an annual pension of $41,862.24, based upon his anticipated salary and bonus increments, at age 65. Unfortunately, prior to hearing argument on appeal, we were advised that Katch had unexpectedly died and his wife as his representative is now acting as plaintiff-appellee.

The summary of facts as related essentially set out Katch's position, although Speidel took issue with some of the material facts stated, particularly Katch's assertion that Speidel had any policy that it would not discharge except for just cause. It took the position at trial that Katch's position was eliminated and that he was laid off in the reorganization of the Cincinnati and Detroit operations, and that Speidel was not precluded lawfully from terminating him for that reason regardless of any alleged "good cause" policy.

Speidel submitted a number of detailed proposed instructions in this case prior to the submission to the jury. In dealing with the issue of mitigation, the trial judge rejected Speidel's requested instructions and gave instead his own instruction, over Speidel's objection. The court's instruction on the duty to mitigate was:

> The plaintiff has a duty to mitigate past and future damages. That means that the plaintiff has had and will in the future have a duty to make a good faith attempt to secure employment *of the same or similar nature.*[1] Your findings with respect to past and future damages should take this duty into consideration.

The judge's refusal to give defendant's requested instruction on mitigation was that he considered it to be "too complex." But in streamlining and simplifying, the judge omitted entirely a critically important element of any instruction on mitigation: the requirement that monies earned in mitigation *must be deducted from damages.* Defendant's requested instruction on mitigation was as follows:

---

1. In his discussion with the attorneys prior to charging the jury, however, the court omitted any mention of the underlined phrase. (Jt.App. 753a).

The proper method of computing these future damages is "(1) on the basis of past experience, project the anticipated level of compensation for similarly situated positions at Speidel Corporation for each of the years until the date on which Plaintiff would have retired had he been allowed to continue his employment relationship at Speidel; (2) on the basis of past experience, project the anticipated earnings of Plaintiff premised upon good-faith attempts on Plaintiff's part to secure employment at the same or similar nature; (3) *subtract the anticipated compensation of Plaintiff for each of the years from the anticipated salary he would have received at Speidel in the corresponding years;* (4) reduce the difference for each year to its worth as of the date of the filing of the complaint; and (5) take the sum of these properly mitigated and reduced figures." (Defendant's Closing Requests to Charge No. 58.)

The colloquy between the court and Speidel's counsel concerning the submission of instructions is as follows:

THE COURT: I have read every one of your instructions and I think they are far too complex and I have decided to give it the way I have read it. All your requests have been noted.

MR. RADCLIFFE: The requests are maintained.

THE COURT: They will be filed.

MR. RADCLIFFE: —for purposes of objection.

■ Federal Rules of Civil Procedure 51 sets out the standard to be applied:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.

While Speidel's counsel was not "distinct" in his objection to the court's instruction on mitigation of damages, we believe that the objection was sufficiently preserved on the record for appellant to assign as error the failure to give the requested instruction, and/or to be heard on appeal that the instruction given was erroneous. Rule 51 is not always strictly enforced according to the letter of the Rule. For instance, oral, rather than written, requests have been found sufficient to inform the court of the point of law involved. *Weathersby v. Gore,* 556 F.2d 1247, 1255–56 (5th Cir.1977); *Dunn v. United States,* 318 F.2d 89, 93 (5th Cir.1963). *See also, Rodgers v. Fisher Body Division,* 739 F.2d 1102 (6th Cir. 1984).

■ Even if an incorrect proposed instruction is submitted which raises an important issue of law involved in light of proof adduced in the case, it becomes the duty of the trial court to frame a proper instruction on the issue raised, and the court's instruction may then be considered on appeal. *Celanese Corp. of America v. Vandalia Warehouse Corp.,* 424 F.2d 1176 (7th Cir.1970); *Messer v. L.B. Foster Co.,* 254 F.2d 412, 414 (5th Cir.1958); *Westchester Fire Ins. Co. v. Hanley,* 284 F.2d 409, 418 (6th Cir.1960).

The judge generally has a duty to frame a requested instruction properly and to submit it to the jury where the legal principle is necessary to the proper determination of the case.

*Jones v. Miles,* 656 F.2d 103, 107 n. 6 (5th Cir.1981). The question of mitigation in this case was an important aspect in view of plaintiff's age at the time of his termination, and the number of years' benefits being claimed. The court's attention was called to the mitigation question, even if specificity was lacking, and the instruction was necessary to insure that subtraction of

income attributable to other employment would be made from the actual award. Katch admitted that during the twenty-three months between his termination and the beginning of trial he earned $37,800, and he testified that he expected to seek employment during the balance of his work life. His "potential for mitigation" was, then, a matter of record, and during his closing argument Katch's attorney virtually conceded that the jury might properly consider a mitigation factor of almost one-third with respect to earnings lost due to this termination.[2]

■ We believe that the court's instruction on mitigation was inadequate in that it was not made clear that the mitigation duty involves a *reduction* from the claimed loss of wages or earnings from the employer against whom plaintiff is seeking recovery for wrongful discharge. Black's Law Dictionary (Rev. 4th ed.) defines "mitigation of damages" as "a *reduction* of the amount of damages ... [because of] facts which show that the plaintiff's conceded cause of action does not entitle him to so large an amount as the showing on his side would otherwise justify ...." (emphasis added). It is pointed out in 58 C.J.S., *Mitigation*, at p. 834 that mitigation is "[a] *lessening* to any extent ...." (emphasis added) (*See also* 25 C.J.S., *Damages*, §§ 96–99). Clearly in this case the jury disregarded the mitigation requirement. Even if the plaintiff's claim of 27.4% increment annually to his maximum annual salary were deemed to be reasonable,[3] the total amount of damages, applying a 5% discount factor to lost earnings and a pension payable at age sixty-five, would amount only to $1,190,000. This amount is arrived at without applying any mitigation factor whatsoever.

The mitigation doctrine has been applied by the United States Supreme Court in construing the words "back pay," by other federal courts in administering like remedial legislation, and by state courts constructing teacher tenure legislation.

The principle of mitigation is a thread permeating the entire jurisprudence. It is not solely a "breach of contract" or "commercial" doctrine; it is part of the much broader principle of avoidable consequences."

Professor McCormick's statement of the general principle of avoidable consequences is unqualified in its application: "Where one person has committed a *tort*, breach of contract, or other *legal wrong* against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages. The person wronged cannot recover for any item of damage which could thus have been avoided."

*Shiffer v. Bd. of Ed. of Gilbraltar Sch. Dist.*, 393 Mich. 190, 224 N.W.2d 255, 258 (1974), (footnotes omitted) (emphasis in original), citing McCormick, *Damages*, § 33, p. 127. *See also, TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 550 (6th Cir.1981), recognizing that the duty to mitigate is clear in Michigan.[4]

We conclude that error was sufficiently assigned in this case to put the court on notice that a more sufficient mitigation of damages instruction was mandated, and that the failure adequately to instruct caused substantial prejudice. It was the court's duty under these circumstances to

2. Based on what he had earned after termination from Speidel and what Katch testified he expected to earn, including a potential increase and bonus, the mitigation factor was nearly 40%. Katch's attorney admitted in a discussion with the trial judge, "there is evidence of mitigation to date [of trial]" and that there was a potential for it in the future. (Jt.App. 576a). He argued to the jury that if the "mitigation factor" were applied, the recovery asked would be about $667,000. (Jt.App. 796a).

3. This takes into account an annual "increase" factor of 6.4% and an annual "bonus" of 21%. We discuss the speculative nature of this claim hereafter.

4. *TCP Industries* differs from this case in that defendant made no request before the jury retired for a mitigation instruction and did not argue mitigation to the jury.

instruct the jurors fully on mitigation. Defendant's requested charge #58, if not technically perfect and more complex than necessary, was a more adequate instruction on this essential element, because it directed the jury to subtract mitigating and off-setting compensation reasonably anticipated by Katch in future years, from reasonably proven loss of earnings from Speidel.

The principle applied was well expressed by the court in *Dahlgren v. United States,* 553 F.2d 434, 440 (5th Cir.) *reh'g denied,* 557 F.2d 456 (1977):

The taxpayer contends that the requested instructions are not all separately technically correct, pointing to the fact that Rule 51 of the Federal Rules of Civil Procedure contemplates that the proposed or requested charge be word perfect.

Dealing with this subject, Wright and Miller, Federal Practice and Procedure, contains the following apt observation: "If the request directs the court's attention to a point upon which an instruction to the jury would be helpful, the court's error in failing to charge may not be excused by technical defects in the request," *citing Florist's Nationwide Telegraphic Delivery Network v. Florist's Telegraph Delivery Association,* 371 F.2d 263 (7th Cir.1967), *Marshall v. Isthmian Lines, Inc.,* 334 F.2d 131 (5th Cir. 1964), and *Messer v. L.B. Foster Co.,* 254 F.2d 412 (5th Cir.1958). The quotation continues: "Ultimately it is the responsibility of the court to be sure that the jury is properly instructed," citing *McClendon v. Reynolds Electrical & Engineering,* 432 F.2d 320 (5th Cir.1970), in which we quoted the following language from 2 Barron and Holtzoff, Federal Practice and Procedure, § 1105, p. 470 (1961):

"It is the inescapable duty of the trial judge to instruct the jurors fully and correctly on the applicable law of the case, and to guide, direct and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth. As one court says, 'This duty is not fulfilled by mere abstract statements or legal definitions, but rather by a fair and impartial statement of the factual issues and the law applicable thereto. The instructions ought to be stated in logical sequence and in the common speech of man if they are to serve their traditional and constitutional purpose in our system of jurisprudence.' "

We must remand this case for further proceedings in light of the error which infected the jury verdict for damages in this case, unless the district court by its own action, through its remittitur, corrected that error. As previously noted, the district court reduced what is recognized to be an obviously excessive verdict, producing for plaintiff an annual income much higher than any salary, including bonus, he had ever earned. Katch in his brief (at p. 33), said "the trial court in considering and ordering remittitur of a portion of the jury award properly viewed the evidence in the light most favorable to Katch, and computed the largest mathematically possible award justified by the evidence and instructions in this case." That action, however, Speidel contends, was entirely insufficient to cure the error, because it was an award based on incorrect instructions which bear on the obligation to reduce a lost earnings award by a proper mitigation factor. It was certainly plain error not to reduce an award for loss of earnings by what had already been earned by Katch prior to trial, and the trier of fact was not given the opportunity under proper instruction to consider also a *reduction* of the award by reasons of the mitigation aspect as to future earnings.

The Michigan law on the proper rate of discount to apply to a damage award to be received now (and to be invested at present investment rates) based upon the loss of prospective earnings to be paid in annual increments in the future is unclear. There appear to be two different decisions making reference to the proper "discount rate." *Freeman v. Lanning Corp.,* 61 Mich.App. 527, 233 N.W.2d 68, 69 (1975), states that "Michigan law clearly requires that damages for future losses be reduced to

present value." *Freeman*, 233 N.W.2d noted, at p. 70, that the plaintiff's recovery is required to be reduced "at the statutory rate of 6%," based upon M.C.L.A. § 600.-6013 and M.S.A. § 27A.6013."[5] On the other hand, *Tiffany v. Christman Co.*, 93 Mich.App. 267, 287 N.W.2d 199, 208 (1979), approved the use of a "five percent annual rate for discounting future damages." In that case, the injury occurred in 1972 and trial took place in 1977. The argument that the statute applied in *Freeman* (M.S.A. § 27A.6013) should control was conceded to have "some merit," but, noting that the statutory change from 5% to 6% had become effective in 1973, ("after plaintiffs' cause of action had occurred"), the court ruled that "any variation" from the old 5% rule "should come from the Supreme Court or the Legislature."[6] *See also, Kovacs v. Chesapeake and Ohio Ry Co.*, 134 Mich.App. 514, 351 N.W.2d 581 (1984); *Goins v. Ford Motor Co.*, 131 Mich. App. 185, 347 N.W.2d 184 (1983).

The trial court in the instant case submitted to the jury for its determination whether a 5% rate or a 9.5% rate[7] should apply. The Michigan Supreme Court apparently has not spoken on this issue since 1981 in *Kinney v. Folkerts*, 84 Mich. 616, 48 N.W. 283. Without ruling on this issue which is unclear under Michigan law, we observe that the five per cent interest rate or discount rate is contrary to the more realistic rates noted in M.S.A. 27A.6013. *See Jones & Laughlin Steel Corp. v. Pfeiffer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983).

In any event, regardless of the effect of what we have deemed to be an erroneous instruction on mitigation of damages and application of what, in light of present economic reality, would seem to be an insufficient discount rate to apply, we are satisfied that the jury did not understand what the court meant by discounting "such future losses ... to the present cash value thereof" in making its award of $1,534,000.[8] The award was clearly far beyond any maximum limit which a jury could find to be compensatory in this case. *See, Jones v. Wittenberg University*, 534 F.2d 1203, 1213 (6th Cir.1976); *Brewer v. Uniroyal, Inc.*, 498 F.2d 973, 977–78 (6th Cir.1974); *Manning v. Altec, Inc.*, 488 F.2d 127, 133 (6th Cir.1973). There is no issue presented on appeal that Katch is entitled to punitive damages. A remittitur was accordingly certainly indicated. If the trial court reduced the award to the "largest mathematically possible award" under erroneous instruction or under improper proof, the remittitur could not cure the inherent error in such a trial.

---

**5.** **§ 27A.6013. Interest on money judgment.** SEC 6013. (1) Interest shall be allowed on a money judgment recovered in a civil action, as provided in this section. (2) For complaints filed before June 1, 1980, in an action involving other than a written instrument having a rate of interest exceeding 6% per year, the interest on the judgment shall be calculated from the date of filing the complaint to June 1, 1980 at the rate of 6% per year and on and after June 1, 1980 to the date of satisfaction of the judgment at the rate of 12% per year compounded annually.

**6.** Further, Michigan standard Jury Instructions (2d ed.) published in 1981, maintained 5% as the proper judgment rate. 2 J. Honigman & C. Hawkins *Michigan Court Rules Annotated*, Rule 516 (1982 Supp., at 195). *See also* MCL 438.31 (M.S.A. 19.13), which provides: "The interest of money shall be at the rate of $5.00 upon $100.00 for a year, and at the same rate for a greater or less sum, and for a longer or shorter time ...."

**7.** This was the rate defendant's expert testified to be the safe investment rate at the time Katch was last employed in contrast to 11% rate he testified would be applicable at time of trial two years later.

**8.** This language was used in the instruction apparently without specific objection by Speidel, before the court discussed the plaintiff's 5% discount contention and the defendant's 9½% contention. Even a modest 5% interest factor applied to the jury's award would return to plaintiff annually approximately two-thirds more than the amount of his highest yearly total compensation, part of which was based on a bonus geared to "sales' performance" (5% of $1,534,600 equals a return of $76,730 versus maximum compensation of $46,734). The jury's award exceeded what Katch indicated was his maximum request of $1,518,700. (*See* Jt. App. 521a).

The award made by the district court after the remittitur is still clearly excessive. Based on a mere six per cent return if the award were invested, plaintiff would receive annually in compensation nearly double the highest base salary plaintiff ever earned and about 75% more than the highest salary and bonus he claimed from Speidel. The "bonus" claimed was based on "sales performance, an uncertain factor, but Katch was permitted to testify and to claim that his "projected future earnings" would be nearly $105,000 in 1995, and continue to rise after that date to 1999, and that he would earn a pension of over $40,-000 a year from 1999 (the year he reached age 65) during the period of his life expectancy. The court (and jury) apparently accepted these claims without any mitigation factor and awarded plaintiff an annual "increase" factor which exceeded the discount rate applied to the amount of his future earnings. The award, even after the remittitur, unquestionably exceeds any reasonable expectation which plaintiff may have had under the circumstances.[9] The projection of lost future earnings over some nineteen years with a 6.4% "annual increase" plus an annual 21% "bonus increase" was based solely on Katch's testimony, and this was calculated by him on a comparison of his salary in 1975 with his manager salary in 1980, and an estimation based on only two years bonus experience. Katch himself admitted that the projection was speculative. His 6.4% projection submitted to the jury appears to be an overestimation.[10]

Plaintiff testified that he had obtained various jobs in sales after termination from Speidel and had earned as much as $3,600 a month. (Jt.App. 563a). Not to apply some mitigation factor in light of Katch's unquestioned ability, and intent, to continue to work, and to carry out his mitigation of damage duty, was simply erroneous in effectuating an adequate remittitur in this case.

■ The Michigan law on mitigation in case of wrongful discharge involves reasonable efforts to obtain work of like nature, taking into account whether the replacement job is merely part-time, whether it involves substantially reduced pay, and whether the job conditions are comparable. *Higgins v. Lawrence*, 107 Mich.App. 178, 309 N.W.2d 194 (1981). In the instant case, Katch, after separation from Speidel, worked in several capacities, obtaining substantial compensation in the sales area, in consulting, and in management.

We have concluded that damages awarded, even after remittitur, in this case are excessive, and the trial judge abused his discretion in not reducing the award to a reasonable figure, based upon the competent evidence bearing upon Katch's compensation at the time of separation and Katch's reasonable future prospects, the net figure being discounted to present value. The district judge was correct in recognizing that the original jury award was without reasonable support in the evidence and/or reflected the jury's evident misunderstanding about discounting future income to a present value and mitigating damages. While excessiveness of a verdict is primarily a matter for the trial court and the judge's conscience on a motion for new trial, appellate courts, within a proper limited and narrow scope of review, may consider and alter the result where there has been an abuse of discretion and the result brings about manifest injustice. *Century*

---

**9.** Katch admitted that in making his assumptions of 6.4% yearly increases through 1998 he was "just speculating." (Jt.App. 518a). The assumption that he would receive an annual 21% bonus on his salary, including the annual 6.4% assumed increase, would likewise fall in the speculation category. The pension claim exceeding $40,000 annually, beginning in 1999, which was based on his last five years of just such speculative earnings, claimed to range from $104,680 in 1994 to $134,161 in 1998.

**10.** Katch testified his base salary in 1975 was $26,607, and that it was $36,283 in 1980, a 26.6% increase, five years later. (Jt.App. 516a, 517a). The proper mathematical computation would seem to be an annual increase of 5.3% instead of 6.4% over that five year period, a very material difference.

*"21" Shows v. Owens,* 400 F.2d 603, 612 (8th Cir.1968). *Taylor v. Washington Terminal Co.,* 409 F.2d 145, 149 (D.C.Cir.) *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969); *Ehret Co. v. Eaton, Yale & Towne, Inc.,* 523 F.2d 280, 285 (7th Cir.1975) *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 186 (1976).

Within the narrow appellate review of damages, particularly after a remittitur has been effected by the district court, we must decide whether the action of the district judge was a clear abuse of discretion. Further, we must decide whether the damages awarded are "clearly within the 'maximum limit of reasonable range.'" *Taylor, supra,* at 149; *Ehret, supra,* at 285. *See Princemont Constr. Corp. v. Smith,* 433 F.2d 1217, 1221, n. 25 (D.C.Cir.1970). Another court has defined the appellant function as determining whether the remittitur reduces the award to the "highest amount which the jury could *properly* have awarded." *Gorsalitz v. Olin Mathieson Chem. Corp.,* 429 F.2d 1033, 1047 (5th Cir.1970), *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972), citing, 3 Barron & Holtzoff, *Federal Practice and Procedure* (Wright ed.), 1305.1, p. 376 (emphasis added). This same standard was applied by this court in modifying a district court damage award in *Petition of U.S. Steel Corp.,* 479 F.2d 489, 501 (6th Cir.) *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973). *See also, Flame Coal Co. v. U.M.W.,* 303 F.2d 39 (6th Cir.) *cert. denied,* 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962), where this court reduced a jury compensatory damage award by the amount of damages deemed merely speculative and conjectural. In summary, we conclude both the jury award of damages, and that established by the district court after remittitur, are clearly beyond the maximum limit of a reasonable range, and beyond the highest amount the jury (or the court) could properly have awarded.

Upon due consideration, we have concluded that Katch has failed to establish facts which would permit a reasonable jury to make an award any greater than $380,-000. Invested at a reasonable rate of re-turn, this would produce to the plaintiff (and his family) a return in the neighborhood of his maximum pay during his employment with Speidel, while leaving the principal untouched. As an alternative to accepting a reduction of the award to $380,-000, plaintiff may opt for a new trial, with respect to damages only. *See Flame Coal Co. v. United Mine Workers of America, supra; Botsford v. Ideal Trucking Co.,* 417 F.2d 681 (2d Cir.1969); *Wicks v. Henken,* 378 F.2d 395 (2d Cir.1967); *Bankers Life & Cas. Co. v. Kirtley,* 307 F.2d 418 (8th Cir.1962).

Accordingly, we remand this case to the district court with orders to proceed as directed above.