James C. O'BYRNE, et al., Plaintiffs,

v.

CHEKER OIL COMPANY, et al., Defendants.

No. 76 C 881.

United States District Court, N. D. Illinois, E. D.

May 7, 1982.

Merle L. Royce, Joyce & Kubasiak, Chicago, Ill., for plaintiffs.

Sherwin J. Malkin, Malkin & Gottlieb, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action was brought by one present and four former lessees of gasoline service stations from Cheker Oil Company ("Cheker"). Summary judgment has already been granted to Cheker[1] and to Marathon Oil Company ("Marathon"),[2] 50% owner of outstanding Cheker stock, on plaintiffs' antitrust and related claims.

1. 530 F.Supp. 70 (N.D.Ill.1981).

2. Unpublished memorandum opinion and order, Sept. 4, 1981.

Cheker has now moved for summary judgment on its counterclaims against plaintiffs James O'Byrne ("O'Byrne") and William A. Erwin ("Erwin") for lease rentals and against O'Byrne for gasoline sold to him. For the reasons stated in this memorandum opinion and order, summary judgment is granted on Cheker's rental claims but not as to the gasoline sales.

*Facts*

Both the O'Byrne lease (on a Mount Prospect, Illinois station) and the Erwin lease (on an Addison, Illinois station) were dated January 17, 1976. They contained identical terms, including a monthly rental of $2,200 payable in advance. In the interest of simplicity this opinion will focus on the history of the O'Byrne-Cheker relationship (for though the specific time periods and the numbers involved differ as to Erwin, the legal principles they bring into play are identical).

O'Byrne used the Mount Prospect premises in February 1976 and then continuously from May 1, 1976 to January 31, 1977 and from September 1, 1978 through February 12, 1979, paying no rent to Cheker for those periods. Cheker claims back rent of $31,994.38. Its like claim against Erwin (covering different periods) aggregates $17,489.62.

Cheker also sues O'Byrne for $6,330.52 for gasoline sold and delivered to O'Byrne for resale to his customers. No comparable claim is asserted against Erwin.

O'Byrne and Erwin rest their opposition to the rental claims primarily on the argument that the lease terms violated regulations promulgated by the Federal Energy Administration ("FEA") pursuant to the Emergency Petroleum Allocation Act of 1973 (the "Act"), 15 U.S.C. §§ 751–56. That violation is said to render the leases void as against public policy and thus unenforceable under Illinois law.[3]

3. Cheker's counterclaim, though originally asserted against an antitrust complaint, is wholly

Analysis of that contention requires some pre-lease factual background. O'Byrne was a Cheker dealer from May 1972 to January 25, 1979. In 1973 (the critical date for purposes of the Act) O'Byrne's lease called for a rent equal to the greater of:

(1) $.02 per gallon of gasoline sold during the month (payable on a daily basis); and

(2) $3,000 (payable, to the extent it exceeded the gallonage figure, on the first day of the following month).

Despite the lease terms requiring payment of at least the "minimum monthly rental" ($3,000 as to O'Byrne and $2,400 as to Erwin), the dealers claim that Cheker did not enforce that provision until March 1974. Because this is a motion for summary judgment and O'Byrne and Erwin are the parties moved against, this opinion assumes Cheker did not in fact enforce the minimum monthly rentals during 1973.[4]

Two aspects of the 1976 lease rental provisions differ from those just outlined:

(1) Instead of the dual rental provision, each 1976 lease called for a flat $2,200 per month (less in each instance than the prior "minimum monthly rental").

(2) Rent was made payable in advance on the first day of each month.

Those changes may be viewed as altering both the rent and the credit terms (because of the changed payment schedule) as between Cheker and its lessees (who were also purchasers of gasoline).

### Effect of the Act and FEA Regulations

■ As gasoline purchasers as well as service station lessees, O'Byrne and Erwin invoke two FEA regulations under the Act, 10 C.F.R. §§ 210.62(a) and (c):

(a) Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period ... and no supplier may modify any normal business practice so as to result in the circumvention of any provisions of this chapter ... [E]xcept as authorized by the Federal Reserve Board, no supplier may require or impose more stringent credit terms or payment schedules on purchasers than those in effect for that class of purchaser ... on May 15, 1973. . . .

(c) Any practice which constitutes a means to obtain a price higher than is permitted by the regulations in this chapter or to impose terms or conditions not customarily imposed upon the sale of an allocated product is a violation of these regulations.

Section 210.62(c) may be dealt with swiftly. No evidence whatever has been tendered indicating that the lease changes were means for Cheker to obtain prices for its gasoline "higher than is permitted by the regulations in this chapter."[5] Section 210.62(c) prohibits not all price increases but only those that go beyond the ceiling set by the regulations. On that score the record is wholly silent. O'Byrne and Erwin have not met their burden to come forward with *some* factual basis for their affirmative defense to avoid summary judgment.[6]

Section 210.62(a), however, could arguably be brought into play by the change from rent payable in daily installments to rent payable in full in advance:

(1) Such a change could well be viewed as a variance of "an ordinary business practice" in effect on May 15, 1973. *See Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 963–64 (6th Cir. 1976); *Vold v. Marathon Oil Co.*, 407 F.Supp. 1011, 1016 (W.D.Ky. 1975); *Guyer v. Cities Service Co.*, 381 F.Supp. 7, 13 (E.D.Wis.1974).

---

contractual in nature. Illinois law of course provides the rule of decision.

**4.** There were other leases in effect between 1973 and 1976. As discussed later, only the 1976 leases sued upon by Cheker and the leases in effect May 15, 1973 are relevant.

**5.** That reference is to Department of Energy ("DOE") regulations, Chapter II, Subchapter A-Oil, 10 C.F.R. §§ 202–21.

**6.** This reasoning also applies to defeat the claim that enforcement of the minimum monthly rentals beginning after 1973 violated Section 210.62(c).

(2) As already indicated, the change might be deemed to have established "more stringent credit terms" within the meaning of the regulation. *See generally Marathon Oil Co. v. Federal Energy Administration*, 547 F.2d 1140, 1147 (Em. App.1976); Federal Energy Office Ruling 1974–10 (April 30, 1974). This opinion will then assume arguendo that the timing of rent payments under the 1976 lease infringes Section 210.62(a).[7]

Even on that assumption, the notion that O'Byrne and Erwin would thereby escape all liability for rent is offensive to justice and (as important for current purposes) Illinois law. Both require that the dealers compensate Cheker for the reasonable rental value of the land they used from 1976 to (in O'Byrne's case) early 1979. *Chesnutt v. Schwartz*, 293 Ill.App. 414, 422, 12 N.E.2d 912, 915 (1st Dist. 1938). Such a recovery *ex contractu* is sanctioned in Illinois "where the contract is merely malum prohibitum and the illegality does not arise from any elements of moral turpitude." I.L.P. Contracts § 194 at 353 (1955), citing *Chesnutt.*

This case is on all fours with *Chesnutt.* If there *is* some limited element of illegality in changing from a daily rental to a month's rent in advance (a kind of minimal effect in terms of extending credit), it has no element of "moral turpitude." Violation of regulations like Section 210.62(a) is "malum prohibitum" (and not malum in se) in the classic sense. *See* W. LaFave & A. Scott, Criminal Law § 6 at 31 n.50 (1972).[8]

O'Byrne and Erwin are therefore liable on Cheker's counterclaim. Even on the assumption most favorable to them, that liability is measured by the reasonable rental value of the premises. On the record that must be the arms-length rental established by the parties in the 1976 leases.[9] Thus the rent under the leases is payable whatever view is taken of the FEA regulations. Summary judgment for back rent is therefore appropriate against O'Byrne in the amount of $31,994.38 and Erwin in the amount of $15,289.62.

### O'Byrne's Gasoline Sales

■ On Cheker's other claims—stemming from gasoline sold at O'Byrne's station between December 28, 1978 and January 25, 1979—a key factual dispute bars summary judgment. O'Byrne's affidavit asserts the amount of gasoline actually sold by O'Byrne, as measured by the gas pump meters, determined his obligation to Cheker. Cheker says O'Byrne owed the difference between (1) the total gallonage delivered to O'Byrne December 28 plus the total gallons in his storage tanks on that date and (2) the total gallons in the tanks January 26.

Cheker claims the "stick readings" taken by Cheker on December 28 and January 26 show that a total of 10,283 gallons were not reported on O'Byrne's meters. O'Byrne claims he "paid Cheker for all gasoline sales made at his station" between the relevant dates. Whether the parties had agreed that the meters readings could be overcome by the stick readings, and whether in any event O'Byrne paid for all gas he sold, are issues of fact that cannot be resolved by summary judgment.

---

7. There is no force to the added claim that Cheker's enforcement of the minimum monthly rentals was a change in "normal business practices" in effect on May 15, 1973 and thus violated Section 210.62(a). Whether actions taken by Cheker after May 15, 1973 would have affected enforcement of *pre*-1976 leases is of course irrelevant to this case. All that is at issue now is the enforceability of the 1976 lease—and it involved only a fixed rental.

8. None of the other affirmative defenses based on FEA regulations merits discussion. Some involve matters having nothing to do with the lease in suit and are thus irrelevant. And the claim that the lease is void as against public policy because Cheker's activities violated the antitrust laws is barred by this Court's earlier opinions.

9. Indeed the 1976 rent appears to have been *less* than the 1973 rent. O'Byrne claims his average monthly sales from July through November 1973 were 161,610 gallons. At $.02 per gallon, this translates to an average monthly rental of $3,232.20, as compared with $2,200 under the 1976 lease. Erwin's average monthly sales from July through November 1973 were 115,796 gallons. That represents an average monthly rental of $2,315.92, again as compared with $2,200 in 1976.

*Conclusion*

As to the claims for back rent under the 1976 lease, there are no genuine issues of material fact and Cheker is entitled to a judgment as a matter of law. Cheker is granted summary judgment against O'Byrne for $31,994.38 and against Erwin for $15,289.62. Cheker's motion for summary judgment as to O'Byrne's liability for gasoline sold by him is denied.