James C. O'BYRNE, et al.,
Plaintiffs-Appellants,

v.

CHEKER OIL COMPANY and Marathon Oil Company, Defendants-Appellees.

Nos. 83–1412, 83–1910.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 9, 1983.
Decided Feb. 9, 1984.

Merle L. Royce, Chicago, Ill., for plaintiffs-appellants.

Sherwin J. Malkin, Ronald W. Teeple, Bergstrom, Davis & Teeple, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, BAUER and COFFEY, Circuit Judges.

CUMMINGS, Chief Judge.

This lawsuit originated in March 1976 when five Illinois Cheker gasoline service station operators filed suit against Cheker and Marathon oil companies alleging that they conspired to drive plaintiffs out of business and that Cheker sought to impose a price squeeze on plaintiffs by charging them excessive wholesale prices while simultaneously increasing their costs of operation. In June 1976, we upheld the district court's refusal to issue a preliminary injunction prohibiting Cheker from terminating plaintiff Sam Mangialardi's gasoline service station lease which had expired on March 31, 1976. In our unpublished order, we noted that defendants had made no retail price suggestions to plaintiffs since March 1974 and that Cheker would hardly have engaged in the so-called price squeeze to eliminate Mangialardi since it could achieve the same result by not renewing his lease. In addition, this Court concluded that plaintiffs had shown no injury by Cheker's agreement with three plaintiffs and a number of other dealers to set Cheker's wholesale price at 3 cents below the price the dealers would have to charge to remain competitive. This Court observed that even though Cheker president Richard P. Small admittedly preferred company-operated stations for reasons of efficiency, of all its dealers wishing to renew their leases only Mangialardi's lease was not renewed, thus indicating that Cheker's plan to go direct "was not the cause of the refusal to renew Mangialardi's lease" (App. 56). In

affirming the denial of the preliminary injunction, we added that the mere refusal to deal with Mangialardi "violates no law" (App. 57).

In May 1978, we reversed and remanded a summary judgment entered in favor of Cheker because there were disputed facts as to whether releases given by plaintiffs to Cheker in the leases between them and Cheker were valid (App. 58–63). That issue is no longer before us.[1]

In the following month, plaintiffs filed their first amended complaint against Cheker and Marathon for violation of the federal antitrust laws and tortious interference with business. This pleading alleged that Cheker was 50% owned by Marathon and that they compete with each other in marketing gasoline and related products at wholesale and retail levels. Plaintiffs claimed that the defendants were also competitors in the retail sale of gasoline and related products through their company stations "not only with each other, but also with plaintiffs and other independent dealers of both Cheker and Marathon" (App. 6).

Count I of the amended complaint asserted that the defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1) by conspiring to distribute through company-operated stations and to have Cheker become the major retail outlet of the two. In Count I plaintiffs requested $600,000 in damages (including trebling under Section 4 of the Clayton Act (15 U.S.C. § 15)), attorney's fees and injunctive relief.

In Count II Cheker, with the assistance of Marathon, is alleged to sell gasoline and related products to plaintiffs and other dealers at discriminatory prices in violation of Section 2(a) of the Robinson-Patman Act (15 U.S.C. § 13(a)). In this Count, plaintiffs sought $450,000 in damages (again including trebling), as well as attorney's fees and injunctive relief.

In Illinois common law Count III, the defendants' conspiracy is said to have had the intent and purpose to interfere with plaintiffs' businesses, damaging them in the amount of $200,000. Still again attorney's fees and injunctive relief were sought.

Judge Shadur handed down opinions and orders on September 4 and December 4, 1981, granting summary judgments to Marathon and Cheker respectively. In the first opinion, which concerned plaintiffs and Marathon, the court held that none of plaintiffs' evidence showed that Marathon conspired with Cheker but that the uncontradicted evidence showed that Cheker's president Richard P. Small made all its business operating decisions and that its own board of directors "really runs the show" (App. 92). According to the district court, plaintiffs presented no evidence that defendants divided up any markets but did show that Marathon specialized in full-service operations while Cheker always specialized in limited-service, lower-priced stations. Summary judgment was also awarded to Marathon with respect to Counts II and III because plaintiffs had failed to prove a conspiracy in restraint of trade between the defendants or that Marathon had assisted Cheker in the violations alleged in those Counts.

In his second opinion, which granted summary judgment to Cheker, the district judge reasoned that since no conspiracy had been shown between Marathon and Cheker, Cheker was entitled to summary judgment under the federal antitrust laws (Count I) and the state common law of tortious interference (Count III). Summary judgment was also rendered for Cheker under Robinson-Patman Act Count III because any price differentiations did not have the requisite adverse effect on competition. 530 F.Supp. 70 (N.D.Ill.1981).

In May 1982, the district court handed down another memorandum opinion and order granting summary judgment to Cheker on its counterclaim against plaintiffs

---

1. In Judge Shadur's fourth opinion, which refused to reconsider the judgment awarding Cheker back rent from plaintiffs O'Byrne and Erwin, he pointed out the judgment was based on reasonable rental values, so that any duress was irrelevant (App. 280–281).

In support of affirmance, the defendants do not rely on the releases contained in the leases.

O'Byrne and Erwin for $31,944.38 and $15,-189.62 respectively for service-station back rent. 539 F.Supp. 278 (N.D.Ill.1982). The correctness of these three summary judgments is before us in appeal No. 83–1412.

In a memorandum opinion and order of April 12, 1983, the district court entered summary judgment in favor of Cheker on its counterclaim for $6,330.52 for gasoline which plaintiff O'Byrne had purchased from Cheker in 1979. Plaintiff O'Byrne has appealed from that fourth judgment in appeal No. 83–1910.

We affirm all four summary judgments and therefore conclude that the district court properly denied plaintiffs' May 1982 motion to reconsider its judgment ordering plaintiffs O'Byrne and Erwin to pay their delinquent rent. The district court was also correct in denying plaintiffs' August 1982 request to vacate the first three summary judgments and in denying O'Byrne's April 1983 motion for reconsideration of the fourth summary judgment which was in favor of Cheker on its counterclaim against O'Byrne for unpaid gasoline.

## I. *Sherman Act Count*

### A. Summary judgment in Marathon's favor

■ In the first of the seven memorandum opinions and orders involved in this appeal, Judge Shadur granted Marathon's motion for summary judgment. The gist of the first Count of the amended complaint against Marathon and Cheker was that Marathon and Cheker conspired to eliminate the competition of the five plaintiff dealers and to drive them out of business. This was supposedly pursuant to the defendants' scheme to force plaintiffs into becoming company stations or to drive them out of business by placing such independent dealers in a cost and profit squeeze "pursuant to a joint plan and conspiracy between CHEKER and MARATHON that CHEKER become the major retail outlet of the two, and that both, to the extent they are both in the retail business, change to company-operated stations" (Count I, par. 26). Defendants' practices allegedly caused

each plaintiff to lose money "through excessive rentals, lost profits and lost income, increased costs of doing business as well as personal inconvenience and hardship" (Count I, par. 34). In his opinion granting Marathon summary judgment on the Sherman Act Count, Judge Shadur noted that both companies were engaged as wholesalers and retailers of petroleum products and that in 1968 Marathon acquired 50% of Cheker's outstanding stock, with the other 50% retained by Richard P. Small, Cheker's founder and chief executive officer.

The district court found that Cheker sells gasoline at wholesale through station-lessee dealers and at retail through its own stations. Cheker stations only sell gasoline and at prices lower than full-service stations. In contrast, Marathon dealers do not emphasize relatively low gas prices but attract customers by providing credit and a full complement of services.

Since 1975, Cheker selects three and Marathon selects the other three of the Cheker directors. However, the district judge noted that Small was responsible for devising Cheker's general operating policies and retained responsibility for its day-to-day operations. The district judge also found that Cheker's policy of converting dealer stations to company stations and steps to implement that policy were fully the design of Small and not discussed beforehand with Marathon. Marathon's affidavits and deposition testimony showed that Marathon played no part in Cheker's conversion from distribution through middlemen to direct retail sales.

Although this lawsuit was filed in March 1976 and plaintiffs had until August 31, 1980 to complete their discovery, the district court concluded that plaintiffs adduced no evidence contradicting defendants' evidence that owner-manager Small "really runs the [Cheker] show" (App. 92) or that defendants divided up any markets. Instead the evidence showed, according to Judge Shadur, that "Marathon has always specialized in full-service operations and Cheker has

always specialized in the limited-service, lower-priced stations" (App. 92).

Although it is true that summary judgment is ordinarily inappropriate to dispose of alleged antitrust violations, summary judgment is appropriate where, as here, there is an absence of any significant probative evidence tending to support the complaint. *First National Bank v. Cities Service*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569. In our judgment, the facts upon which plaintiffs rely to support their Sherman Act conspiracy allegations are not susceptible of the interpretation they seek to give them, so that summary judgment for Marathon was appropriate. Since plaintiffs had ample time to substantiate their claims of conspiracy but were unable to do so, the trial judge's grant of summary judgment to Marathon was proper. 391 U.S. at 298–299, 88 S.Ct. at 1597. *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 464 (7th Cir.1981); *Oreck Corporation v. Whirlpool Corp.*, 1980–81 Trade Cases ¶ 63,619 (2d Cir.1980); *Lamb's Patio Theater, Inc. v. Universal Film Exchanges, Inc.*, 582 F.2d 1068 (7th Cir.1978). This is especially so since all five plaintiffs' depositions showed that they had no evidence of a Marathon-Cheker conspiracy.[2] In addition, the uncontradicted affidavit of Richard E. White, manager of Marathon's wholesale marketing division, concludes as follows:

> Marathon has never, either alone or in concert with Cheker, taken any action intending to do wrongful harm or injury to plaintiffs or to interfere in any way with their businesses. Marathon has never exercised any control over the operations of Cheker, Cheker's prices or Cheker's dealings with its dealers or other customers. Marathon has never agreed or conspired with Cheker in any way to unlawfully restrain trade or to illegally fix prices. Marathon has never participated in any decisions relating to Cheker's leasing practices, Cheker's tank wagon prices of gasoline or Cheker's dealers' resale prices. Marathon has never assist-

ed (or otherwise participated with) Cheker in selling gasoline and related products to plaintiffs or any one else at different and discriminatory prices.

App. 82. Finally, the fact that four of the five plaintiffs were offered and accepted leases in 1976 from Cheker shows that Marathon did not conspire with Cheker to convert those stations into company-operated stations. Cheker's president Small's decision not to renew Mangialardi's lease was his alone; Marathon had nothing to do with it.

In Count I, plaintiffs also claim that while Cheker was converting dealer-operated stations to company-operated stations, Marathon was at the same time withdrawing from the retail market, thus causing a horizontal division of the gasoline market. The evidence is to the contrary because between 1976 and 1980 the number of secondary brand retail outlets operated by Marathon's subsidiaries grew from 650 to 720 and from 18 to 32 in Illinois. Moreover, Marathon has almost 1,100 independent marketer customers and continues to attempt to recruit more of them, while at the same time Marathon-operated outlets have declined tremendously (App. 73; Plaintiffs' Br. 12). These statistics further belie plaintiffs' charge that Marathon and Cheker have conspired that each will attempt to eliminate independent dealers in favor of company dealers and to have Marathon turn over its independent dealers to Cheker. On this record, the district court correctly concluded that defendants did not agree to divide up any territories.

**B. Summary judgment in Cheker's favor**

■ Judge Shadur's second opinion granted summary judgment to Cheker and is reported in 530 F.Supp. 70 (N.D.Ill.1981). In that opinion, the district court concluded that since alleged co-conspirator Marathon had been granted summary judgment because no conspiracy was shown, summary judgment should also be entered in favor of

**2.** O'Byrne deposition 166, 185; Mangialardi deposition 81, 83; Erwin deposition 55–56; Lawrence Roncoli deposition 34–36; Theodore Roncoli deposition 47–48.

Cheker, its alleged co-conspirator. As seen, there was no proof that Cheker and Marathon conspired to drive plaintiffs out of business or otherwise to violate Section 1 of the Sherman Act. That is because the evidence showed that Cheker alone made all decisions relating to its business operations, and its decision to convert from dealer to company operation was made solely by Cheker president Richard P. Small. Furthermore, in our own order of June 30, 1976, we pointed out that plaintiff Mangialardi had "presented no evidence of a conspiracy necessary for section 1 liability." As we noted in that order, Cheker would not have engaged in a price squeeze to eliminate Mangialardi because Cheker could have done so simply by not renewing his lease. Plaintiffs argue that Federal Energy Administration (FEA) regulations in effect at the time prohibited Cheker's termination of a dealer without prior FEA approval. To avoid these regulations, Cheker and Marathon allegedly agreed that Cheker would force dealers out of business by means of a price freeze. However, the evidence does not support plaintiffs' price squeeze claim. In fact instead of Cheker's attempting to drive plaintiffs out of business, they admit that from the fall of 1975 to the spring of 1976 Cheker gave them a substantial competitive price allowance, causing their profits to rise dramatically (Plaintiffs' Br. 22).

## II. *Robinson-Patman Count*

Count II of the amended complaint charges that Cheker sells gasoline and related products to plaintiffs at discriminatory prices as between them and other dealers of Cheker and that Marathon assists Cheker in that regard. Judge Shadur's first opinion granting summary judgment in favor of Marathon disposed of Count II on the ground that no such assistance or conspiracy had been shown. His second opinion, which granted summary judgment to Cheker, disposed of the Robinson-Patman Act Count by holding that plaintiffs misread that statute. 530 F.Supp. 70, 71 (N.D.Ill. 1982).

Plaintiffs have been unable to point to any evidence that Cheker charged its various independent dealers discriminatory prices. Both Mr. Small's affidavit and Mr. O'Byrne's deposition show that Cheker gave competitive allowances to all plaintiffs in 1975 and subsequently has charged its independent dealers the same tank wagon (wholesale) price (App. 98; O'Byrne Dep. 174–175, 183).

■ Plaintiffs have attempted to support Count II by comparing retail prices charged by certain Cheker company stations with the wholesale prices which Cheker charged to plaintiffs. However, under Section 2(a) of the Robinson-Patman Act (15 U.S.C. § 13(a)) there is no violation unless discrimination is "in price between different purchasers" on the same level of competition. *American Oil Co. v. McMullin*, 508 F.2d 1345, 1353 (10th Cir.1975), and Von Kalinowski, Antitrust Laws and Trade Regulations § 29.01[3][a] at 29–9 and § 30.62[2] at 30–64 to 30–65. Cheker of course did not sell to its company-owned stations so that no discrimination "in price between different purchasers" (Section 2(a)) has occurred. *Security Tire and Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962, 967 (5th Cir.1979), certiorari denied, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309; *City of Groton v. Connecticut Light and Power Co.*, 497 F.Supp. 1040 (D.Conn.1980); F. Rowe, *Price Discrimination Under the Robinson-Patman Act* 178 (1962).

■ As to plaintiffs' reply brief allegation that Cheker discriminated in price because its company-owned dealers undercut plaintiffs' retail prices, neither the company's own dealers nor those dealers' ultimate purchasers are competing purchasers *vis a vis* independent dealers like plaintiffs, so that the Robinson-Patman Act is inapplicable. *Falls City Industries, Inc. v. Vanco Beverage Inc.*, —— U.S. ——, ——, 103 S.Ct. 1282, 1288–89, 75 L.Ed.2d 174; *Federal Trade Commission v. Morton Salt Co.*, 334 U.S. 37, 46, 50–51, 68 S.Ct. 822, 828, 830, 92 L.Ed. 1196; III E. Kintner & J. Bauer, Kintner's Federal Antitrust Laws, § 22.12 at 295 (1983).

■ Plaintiffs' reply brief contends that Cheker's company-owned stations' undercutting of plaintiffs' pump prices is a primary-line injury under the Robinson-Patman Act. As stated in the reply brief:

> Plaintiffs' injury is a *primary line injury* based on Cheker's predatory pricing practices at [company-owned] co-op stations which competed with plaintiffs for retail sales to customers. Cheker's [company-owned] co-ops consistently undercut plaintiffs' pump prices (Supp.App. 33–56) and at times operated near or below their cost.

(Reply Br. 24; emphasis supplied.)

Plaintiffs have evidently switched to this theory, not even pleaded in Count II, because the evidence does not support their Count II allegation that Cheker discriminated in price among independent dealers. However, plaintiffs have not stated a cognizable claim under the Robinson-Patman Act under this new theory either. Primary line competition means competition between a discriminating seller and its competitors (*Federal Trade Commission v. Anheuser-Busch, Inc.*, 363 U.S. 536, 544–546, 80 S.Ct. 1267, 1271–72, 4 L.Ed.2d 1385) and such is not involved in this case. The pricing plaintiffs complain about is based on "competition [that] exists between a supplier [Cheker and its own stations] and his wholesale purchaser[s] [plaintiffs] for the trade of the [ultimate] user" (Reply Br. 15), and Section 2(a) does not reach that type of competition. *American Oil Co. v. McMullin*, 508 F.2d at 1353; F. Rowe, *supra*, at 178 n. 24 and accompanying text. Absent the defense of meeting competition, the statute might have been violated if Cheker sold to plaintiffs and other independents at different prices but, as seen, there was no such conduct. Finally, it should be noted that plaintiffs no longer press the Robinson-Patman Count against Marathon. Summary judgment for both defendants was appropriate on Count II.

### III. *Interference with Competition Count*

■ The last Count of the amended complaint alleges that in violation of Illinois common law the defendants conspired to interfere with plaintiffs' businesses and that plaintiffs were injured by such interference. The district court's first order, which granted summary judgment to Marathon on Count III, was based on the failure to prove a conspiracy in restraint of trade between Marathon and Cheker. Its second summary judgment held that Count III must also fail against Cheker because Marathon was not shown to be a co-conspirator. For want of such proof the district court was correct in holding Count III to be deficient as to Cheker. Plaintiffs have not argued that Count III was sufficient as to Marathon.

### IV. *Reconsideration of Summary Judgments Favoring Defendants Was Unnecessary.*

■ In still another opinion, this one dated November 11, 1982, the district court refused to reconsider the summary judgments granted defendants on all three Counts of the amended complaint. Plaintiffs urge that reconsideration was warranted because Cheker did not disclose a settlement agreement between it and the Federal Energy Administration ("FEA") nor a decision of the FEA denying Cheker's petition for an exemption from certain FEA regulations. However, as the district court stated, plaintiffs had not established that those documents would implicate the summary judgments and indeed failed to show a nexus between those documents "and the dispositive issues in the [summary judgment] Opinions" (App. 252).

Plaintiffs assert that the FEA-Cheker settlement agreement showed that Cheker was the subject of a FEA civil investigative demand or an investigation into Cheker's pricing activities as covered by plaintiffs' interrogatories 4 and 6 (App. 192–193). Instead the settlement agreement arose from a routine audit conducted of all oil companies for the period November 1973 through November 1974 (Supp.App. 74–77). Therefore the agreement did not come within those interrogatories. Moreover, the agreement was contained in Cheker's FEA file

which had been made available to plaintiffs' attorneys (Supp.App. 76) and in no way evidenced a conspiracy between Cheker and Marathon. The second document, the FEA decision denying Cheker's exemption petition, as the district judge noted was also no ground for vacating the summary judgments because it too had nothing to do with the bases therefor.

Although plaintiffs contend that Cheker breached its discovery obligations by not producing these two documents, sanctions were properly denied because the first document did not concern an investigation and Cheker did respond to plaintiffs' interrogatory No. 4 by stating that there were "routine audits by the Federal Energy Administration." In addition, as already noted, the settlement agreement was in the FEA file Cheker delivered to plaintiffs for inspection. Also, as noted by the district judge, the decision and order of the FEA denying exemption was not required because it was not responsive to plaintiffs' interrogatories and was published in the CCH Reporter dealing with FEA matters (Cheker Oil Company, 2 FEA ¶ 83,239 (8/12/75)) and therefore readily available to plaintiffs.

### V. Cheker's Claim for Delinquent Rent

█ In his third opinion, Judge Shadur entered summary judgment against plaintiff O'Byrne for $31,994.38 and against plaintiff Erwin for $15,289.62. 539 F.Supp. 278. Cheker claimed this back rent in counterclaims against these plaintiffs. While the district court assumed that Cheker's 1976 requirement that rent be made payable in advance on the first day of the month may have violated Section 210.62(a) of the FEA regulations because this change might be a variance of "an ordinary business practice" and the establishment of

"more stringent credit terms" within the meaning of that regulation,[3] the two dealers must nevertheless compensate Cheker for the reasonable rental value of the land. Chesnutt v. Schwartz, 293 Ill.App. 414, 422, 12 N.E.2d 912 (1st Dist.1938).

As the district court noted, Section 210.-62(c) of the regulations[4] relied upon by plaintiffs was not violated because it prohibits only price increases going beyond the ceiling set by the regulations, and there has been no showing of such increases. Indeed the rental agreed upon in the 1976 leases was less than the rent charged in the 1973 leases, 539 F.Supp. at 281 n. 9. Moreover, the record shows that the price for gasoline charged to both plaintiffs was several cents below the FEA maximum (App. 98, 128).

While plaintiffs state that they signed the 1976 leases as a result of duress, the new rental favored O'Byrne and he was not forced to sign the 1976 lease (Tr. 122, 123), and Erwin also testified that he was satisfied with the terms of the 1976 three-year lease (Erwin Dep. 17, 25).

In his memorandum opinion of September 8, 1982, Judge Shadur denied plaintiffs' motion to reconsider the May 1982 rental opinion reported in 539 F.Supp. 278. Plaintiffs' claim of duress was rejected because (1) Cheker was, regardless of duress, entitled to the fair rental value of the premises, (2) the evidence showed that both O'Byrne and Erwin were satisfied with the amount of rental, and (3) the court had awarded Cheker even less than the reasonable rental values of the two properties for the relevant periods beginning in 1976 (App. 280–281).

In its fifth opinion, dated November 11, 1982, the district court was correct in deny-

---

**3.** 10 C.F.R. § 210.62(a) (1979) provided:

Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period ... and no supplier may modify any normal business practice so as to result in the circumvention of any provisions of this chapter... [N]o supplier may require or impose more stringent credit terms or payment schedules on purchasers than those in effect

for that class of purchaser ... on May 15, 1973. * * *

**4.** 10 C.F.R. § 210.62(c) (1979) provided:

Any practice which constitutes a means to obtain a price higher than is permitted by the regulations in this chapter or to impose terms or conditions not customarily imposed upon the sale of an allocated product is a violation of these regulations.

ing reconsideration of its rental judgments favoring Cheker because the two documents on which plaintiffs relied for reconsideration had nothing to do with Cheker's counterclaim for unpaid rent (App. 253–254).

VI. *Cheker's Claim for Unpaid Gasoline*

▮ The district court's sixth opinion in this case awarded Cheker $6,330.52 plus interest for unreimbursed gasoline sales to O'Byrne from January 1 through January 25, 1979. In that opinion the district court held that O'Byrne was contractually responsible for all gasoline deliveries, including unsold gasoline. This conclusion was supported by the notice in each dealer remittance form that full payment for each delivery was due no later than 10 days from the date of delivery (App. 340). Cheker's chief executive officer Richard P. Small's affidavit is to the same effect, so that the summary judgment for unpaid gasoline was correct.

The seventh and final memorandum order of the district court denied reconsideration of the summary judgment for Cheker on its counterclaim for gasoline sold to O'Byrne. In this opinion, the district judge denied O'Byrne's attempt to file new affidavits because O'Byrne had an affirmative duty to file material in opposing Cheker's motion for summary judgment and could not properly file affidavits after summary judgment was granted to his opponent. *Walker v. Hoffman*, 583 F.2d 1073, 1075 (9th Cir.1978); *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir.1972). In any event, the district court was entitled to deny the motion for reconsideration because the affidavits would "not deal directly with the *ownership* issue that was controlling on the summary judgment motions" (App. 369 n. 2).

The four summary judgments and the three orders denying reconsideration are affirmed.[5]

5. The summary judgment for Cheker on its counterclaim against O'Byrne for unpaid gasoline and its order denying O'Byrne's motion for reconsideration are disposed of in appeal No. 83–1910, whereas the other five orders are disposed of in appeal No. 83–1412.

We have considered all points raised by plaintiffs and have discussed herein all the non-frivolous ones.