**RUSS' KWIK CAR WASH, INC.; Clean Cars, Inc., Plaintiffs-Appellants,**

v.

**MARATHON PETROLEUM COMPANY; Gastown, Inc.; Emro Marketing Company, Defendants-Appellees.**

No. 84–3097.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 25, 1985.

Decided Sept. 5, 1985.

Kennedy, Circuit Judge, filed a dissenting opinion.

David M. Schnorf, Donna M. Engwert, Schnorf, Wanick, Loyd & Engwert, and Kelly D. Stimpson, argued, Toledo, Ohio, for plaintiffs-appellants.

Paul M. Pohl, argued, Jones, Day, Reavis & Pogue, and A. Theodore Gardiner III, Cleveland, Ohio, for defendants-appellees.

Before KENNEDY and CONTIE, Circuit Judges, and HILLMAN, District Judge.*

PER CURIAM.

Plaintiffs appeal from the summary judgment granted in favor of defendants in this antitrust action. The principal issue on appeal is whether the transfer of a product from a parent corporation to its wholly-owned subsidiary corporation is a "sale" for purposes of section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a). We hold that it is not and affirm.

## I

This case arises from the operation of a car wash and gasoline station by plaintiffs Russ' Kwik Car Wash, Inc. and Clean Cars, Inc. The plaintiffs' facility is located on an "L"-shaped parcel of land adjacent to one corner of a major Toledo, Ohio intersection. On the corner lot, surrounded on two sides by the "L"-shaped lot, is a Gastown service station owned and operated by defendant Emro Marketing Company, a wholly-owned subsidiary of defendant Marathon Petroleum Company. Gastown is an unincorporated division of Emro Marketing Company.[1] The "L"-shaped parcel is owned by Marathon and leased to Russ' Kwik for a period of fifteen to thirty years, ending in 1995. In conjunction with the lease, Russ' Kwik and Marathon entered into a supply agreement under which Marathon agreed to sup-ply Russ' Kwik with Marathon brand gasoline and other petroleum products.

In 1976 Russ' Kwik changed ownership, and the new owners installed new equipment and decided on a new marketing strategy. Their new policy was to sell their Marathon gasoline a penny per gallon cheaper than any of the four other gas stations at the intersection, thereby attracting gas customers, some of whom would also purchase car washes. In 1977, self-service stations became legal in Ohio, and Emro decided to convert the corner Gastown station to self-serve. Emro unsuccessfully negotiated with Russ' Kwik in an effort to obtain some or all of the leased property for use in expanding the Gastown station. When the Gastown began operating on a self-serve basis, a price war broke out between the Gastown station and Russ' Kwik. Russ' Kwik alleges that on occasion the Gastown station dropped its retail price beneath the wholesale price that Marathon charged Russ' Kwik, and that Marathon charged Russ' Kwik a higher price for gasoline than it charged Emro.

Russ' Kwik and its owner, Clean Cars, Inc., then brought this antitrust action, alleging violations of sections 1 and 2 of the Sherman Act, section 3 of the Clayton Act, and section 2 of the Robinson-Patman Act, as well as several pendent state claims. The defendants moved for summary judgment on all claims, and both sides submitted affidavits and depositions. The District Court granted summary judgment for defendants on all claims, and plaintiffs appeal. On appeal the plaintiffs do not contest the dismissal of their Sherman Act § 2 monopolization claim or the pendent state claims. Plaintiffs also do not contest on appeal the dismissal of their claims under §§ 2(d) and 2(e) of the Robinson-Patman Act. The only remaining Robinson-Patman Act claim is under § 2(a).

Summary judgment is proper when "the pleadings, depositions, answers to interrog-

---

* The Honorable Douglas W. Hillman, United States District Court for the Western District of Michigan, sitting by designation.

1. Defendant Gastown, Inc. is a name-holding corporation that performs no services.

atories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). "In ruling on a motion for summary judgment the trial court must view the evidence in the light most favorable to the party opposing the motion. On review this Court must do the same." *New Jersey Life Insurance Co. v. Getz,* 622 F.2d 198, 200 (6th Cir.1980). With these standards in mind, we will first consider plaintiffs' Sherman Act § 1 and illegal tying arrangement claims, and then plaintiffs' Robinson-Patman Act claim.

## II

In their memorandum supporting their motion for summary judgment on the Sherman Act § 1 claim, the defendants argued that summary judgment was proper for two reasons: (1) there was no evidence that Marathon had communicated with Emro about plaintiffs, and (2) a corporation is legally incapable of conspiring with its subsidiary. The District Court granted summary judgment on the grounds that "the plaintiffs have produced no evidence of a conspiracy." We need not consider whether this conclusion was correct, however, since it is clear, after the Supreme Court's opinion in *Copperweld Corp. v. Independence Tube Corp.,* —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that the summary judgment was proper on this claim for the second reason advanced by defendants. A decision below must be affirmed if correct for any reason, including a reason not considered by the lower court. *J.E. Riley Investment Co. v. Commissioner,* 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940).

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . .

This section applies only to action by at least two separate entities that form a contract, combination, or conspiracy. *E.g., Copperweld,* 104 S.Ct. at 2740. In *Copperweld* the Supreme Court overruled earlier cases that had supported the "intra-enterprise conspiracy" doctrine, and held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Copperweld,* 104 S.Ct. at 2742. The only conspiracy alleged in this case is one between Marathon and Emro. There is no dispute that Emro is a wholly-owned subsidiary of Marathon. Judgment for defendants on the section 1 conspiracy claim must therefore be affirmed.

## III

Plaintiffs alleged that the defendants improperly tied the lease of the "L"-shaped parcel to the sale of Marathon gasoline, in violation of § 3 of the Clayton Act. The District Court correctly granted summary judgment for defendants in the Clayton Act § 3 claim because that section applies only to sales of "commodities," which do not include the lease of real property. *See Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 13 & n. 1, 78 S.Ct. 514, 522 & n. 1, 2 L.Ed.2d 545 (1958) (Harlan, J., dissenting); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 469 n. 24 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Tire Sales Corp. v. Cities Service Oil Co.,* 410 F.Supp. 1222, 1227 (N.D.Ill.1976), *rev'd on other grounds,* 637 F.2d 467 (7th Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981).

In their complaint plaintiffs expressly based their tying claim on § 3 of the Clayton Act. In their motion for summary judgment, defendants argued that the tying claim could not proceed under the Clayton Act since a lease of real property is not covered by that statute. In response, plaintiffs specifically argued that their tying claim should be allowed to proceed under § 3 of the Clayton Act. In their reply defendants reiterated their argument that

the Clayton Act does not apply to a lease of real property. Plaintiffs then brought their own motion for summary judgment in which they again pressed the validity of their tying claim under § 3 of the Clayton Act.

■ In their briefs on appeal, plaintiffs have abandoned the theory of their tying claim that they repeatedly urged in the District Court, and now contend that the District Court erred in granting summary judgment because the tying claim should be allowed to proceed under § 1 of the Sherman Act. This Court, however, will generally not consider questions not raised in the court below. *E.g., Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 120, 78 L.Ed.2d 119 (1984); *Ruip v. United States*, 555 F.2d 1331, 1337 (6th Cir.1977); *Bannert v. American Can Co.*, 525 F.2d 104, 111 (6th Cir.1975), *cert. denied,* 426 U.S. 942, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Dupes v. Johnson*, 353 F.2d 103, 105 (6th Cir.1965). Plaintiffs' arguments concerning the sufficiency of pleadings are inapposite; although it is possible that plaintiffs would have been allowed to raise a Sherman Act § 1 tying claim in the District Court, the fact is that they made no attempt to raise such a claim even after defendants twice argued that the tying claim could not proceed under the Clayton Act. Our refusal to consider this claim is particularly appropriate here because defendants have not had the opportunity to submit affidavits in support of summary judgment on a Sherman Act tying claim. A Sherman Act tying claim requires a showing of monopoly power in the tying product, which is not needed under the Clayton Act if a substantial volume of commerce in the tied product is restrained. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 608–09, 73 S.Ct. 872, 880–81, 97 L.Ed. 1277 (1953). The rule that this Court will not consider questions not presented below "applies with particular force when the new issue requires development of additional facts." *Brown v. Marshall*, 704 F.2d 333, 334 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 120, 78

L.Ed.2d 119 (1984). The District Court did not err in granting summary judgment for defendants on plaintiffs' tying claim.

### IV

■ Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Antidiscrimination Act, 15 U.S.C. § 13(a), provides in part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

The essence of plaintiffs' Robinson-Patman Act claim is that Marathon sold gasoline at a cheaper price to Emro for its Gastown station than to Russ' Kwik for its Marathon station, and that such discrimination entailed the possibility of an adverse effect on competition. At least two separate sales to different purchasers must take place in order to constitute discrimination under the Robinson-Patman Act. *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 755, 67 S.Ct. 1015, 1020, 91 L.Ed. 1219 (1947). The District Court, relying on the Fifth Circuit's decision in *Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962 (5th Cir.), *cert. denied,* 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979), held that a transfer from a parent corporation to a wholly-owned subsidiary corporation could not be considered a sale for purposes of the Robinson-Patman Act. We must, therefore, consider whether the District Court used the correct standard in determining that a transfer from Marathon to Emro did not constitute a sale.

## A

In *Security Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962 (5th Cir.), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979), the Fifth Circuit reversed a judgment for plaintiff on a Robinson-Patman Act § 2(a) claim, where the alleged favored sale consisted of a transfer from a tire manufacturer to a wholly-owned subsidiary retailer. The court held that "transfers from a parent corporation to its wholly-owned subsidiary corporation can never be considered separate sales to a favored customer in a Robinson-Patman Act discrimination suit." 598 F.2d at 965. The court reasoned that:

> The Robinson-Patman Act separates out and makes illegal competitively harmful discrimination. Intra-corporate transfers between parent and wholly-owned subsidiary are not the type of transactions the Robinson-Patman Act meant to regulate. The realistic effect on competition should control rather than esoteric and theoretical possibilities under the *Danko* [*v. Shell Oil Co.*, 115 F.Supp. 886 (E.D.N.Y.1953)] theory couched in terms of "control" and "arm's length dealings."

*Id.* at 967.[2]

The essence of the *Security Tire* holding is summarized by the Fifth Circuit in *Eximco, Inc. v. Trane Co.*, 737 F.2d 505, 516 (5th Cir.), *reh'g denied*, 748 F.2d 287 (1984).

> The court in *Security Tire* specifically rejected legal authority holding that a

manufacturer's company-owned outlet competed in an antitrust sense with other outlets who purchased the manufacturer's products for resale. *See id.* at 965–66 and n. 1. In rejecting this authority, the court looked behind distribution structure to ascertain the identity of the true competitors. "Realistically," the court determined, "the competition here was between [the manufacturer and its subsidiary outlet] as a single economic unit, on the one hand, and Plaintiffs, on the other hand." *Id.* at 967. "Internal transfers" between the two levels in the distribution chain, were "of no real competitive consequence" to the alleged disfavored buyer. Thus, the price differential was not the kind of economic injury protected by the antitrust laws, because the transfer between a corporation and its subsidiary could not be considered a favored sale. *Id. Accord Brown v. Hansen Publications, Inc.*, 556 F.2d 969 (9th Cir.1977); *Uniroyal Inc. v. Hoff and Thames, Inc.*, 511 F.Supp. 1060, 1067 (S.D.Miss.1981). *See also* ABA Antitrust Section, Monograph No. 4, *The Robinson-Patman Act: Policy and Law*, Vol. 1, 48–50 (1980).

Plaintiffs argue that the earlier Sixth Circuit decisions that have considered this question have applied the control test and indicated that, at least under some circumstances, a transfer to a subsidiary corporation can constitute a sale.

---

**2.** Apparently no other United States court of appeals has either adopted or rejected the Fifth Circuit's holding in *Security Tire*. No other circuit court has been faced with the question or offered an opinion in dicta. In *Schaben v. Samuel Moore & Co.*, 606 F.2d 831, 833 n. 3 (8th Cir.1979), the Eighth Circuit expressly found it unnecessary to adopt *Security Tire* because of a factual finding that the subsidiary was treated as a profit center or division rather than as a separate corporation. In *O'Byrne v. Checker Oil Co.*, 727 F.2d 159 (7th Cir.1984), the Seventh Circuit, citing *Security Tire*, held that there was no violation because there was no sale from seller to seller-owned stations. Prior to *Security Tire*, the Ninth Circuit held in *Brown v. Hansen Publications, Inc.*, 556 F.2d 969 (9th Cir.1977), that a transfer between sibling corporations was not a "sale" for Robinson-Patman

Act purposes because the siblings were operated as a single integrated enterprise.

The limited number of opinions expressed by commentators on this question have been mixed. *See* III E. Kintner & J. Bauer, *Federal Antitrust Law* § 21.15 (1983) ("If the subsidiary really is an independent, profit-making center, with an ability to make its own pricing and resale decisions, and if goods indeed are sold to it, *i.e.*, if title and risk of loss have passed, the likelihood of substantial injury to competition may be as great as with sales to a completely unrelated company."); Comment, *Application of the Robinson-Patman Act to Price Discrimination in Intra-Enterprise Transactions*, 53 N.W.U. L.Rev. 253 (1958). *But see* Adelman, *Effective Competition and the Anti-Trust Laws*, 61 Harv.L. Rev. 1289 (1948).

The first Sixth Circuit decision to address this question was *Brewer v. Uniroyal, Inc.*, 498 F.2d 973 (6th Cir.1974). In *Brewer* the plaintiff was a tire retailer who sold tires made by Uniroyal. The plaintiff claimed that Uniroyal gave United Tire, plaintiff's competitor, favorably discriminatory prices both before and after United Tire was purchased by Uniroyal. The jury awarded damages only for the price discrimination that occurred before Uniroyal acquired United Tire. This Court upheld the jury verdict of "damages for a period during which Uniroyal did not control the day-to-day operations of United." 498 F.2d at 977. Although we expressly declined to decide the question, in a footnote the Court discussed the "control" test for determining whether a transfer to a subsidiary constitutes a sale:

> We agree that a sales subsidiary could be found to be independent of its parent and thus be considered a "purchaser" or "customer" under the Act.... [I]t has been held that in determining whether a seller-purchaser relationship exists, the critical factor is the exercise of domain and control over the subsidiary by the parent, not the competitive relationship.... This standard is used in determining whether a parent and its subsidiary are a single entity and can be considered a single seller under the Robinson-Patman Act ... and in determining whether a buyer from a distributor is an "indirect purchaser" from the supplier of the distributor.... Thus, the courts which have ruled on the question have found it appropriate that the same standard be applied to determine whether a sales subsidiary can be deemed a purchaser from its parent.

498 F.2d at 977 n. 2 (citations omitted).

This Circuit was more directly faced with the present question in *Parrish v. Cox*, 586 F.2d 9 (6th Cir.1978). Parrish was the operator of one of six service stations supplied by Cox. Four of the stations had been taken over by Cox when abandoned by their operators. This Court affirmed the District Court's judgment in favor of defendant Cox, relying on the District Court's finding "that Cox exercised such control over the company-managed stations that there could be no sales between them within the meaning of the Act." 586 F.2d at 12 (footnote omitted). The District Court's holding was premised on its view that "even if the company-managed stations were deemed subsidiaries of defendant, they must be operated independently of dominion and control of defendant in order for there to be a sale between them." *Id.* The Court cited the District Court's findings that the parent maintained daily supervision over the stations, kept business records for the stations, and made all management and pricing decisions for the stations. 586 F.2d at 12 n. 7.

The most recent Sixth Circuit case on point is *Shavrnoch v. Clark Oil & Refining Corp.*, 726 F.2d 291 (6th Cir.1984). In *Shavrnoch* an independent station operator complained that Clark Oil sold gas more cheaply to company-owned stations than to the plaintiff. In upholding summary judgment in favor of Clark Oil, this Court reasoned as follows:

> We hold that *Parrish* should be followed in this case. Clark presented uncontroverted evidence that it maintained complete dominion and control over its company-operated stations. All of the employees who work at these stations are Clark employees. Clark determines the amount of gasoline sent to these stations and sets the retail prices. Clark also maintains the business records of the company-operated stations and maintains complete supervisory authority over the stations. Under these circumstances, we hold that the intra-corporate transfers of gasoline from Clark to its company-operated stations are not sales within the meaning of the statute.

726 F.2d at 295.

Each of the three Sixth Circuit cases that have considered the question, therefore, have espoused a "control" standard for determining whether two entities are so closely related as to preclude the possibility that a transfer of goods from one to the

other is a "sale" for Robinson-Patman Act purposes, a standard unnecessary to consider under the per se rule of *Security Tire.*

We first consider whether, as defendants contend, the District Court may be affirmed on the ground that even under the *Parrish* control test there is no issue of fact but that there was no "sale" from Marathon to Emro. If this is the case, we need not reach the question of whether the *Security Tire* per se rule is correct.

Defendants rely on deposition statements, made by two of plaintiffs' officers, to the effect that they considered Marathon and Emro to be the same entity. However, we do not consider the impressions of plaintiffs' officers to be dispositive of the legal question of whether Marathon and Emro were operated as a single integrated enterprise.[3] The plaintiffs' officers were not addressing themselves to this particular question, and in any event could not be expected to have detailed personal knowledge concerning the relationship between Marathon and Emro. The plaintiffs' complaint clearly alleged the existence of a sale from Marathon to Emro.

We must decline to decide at this stage whether summary judgment for either party would be proper under the *Parrish* control standard. The District Court did not address this question, and the parties' arguments in this Court have been primarily directed at other issues. The record already consists of thirteen volumes of depositions and two volumes of pleadings. If the case is to be decided on the control issue basis we think the District Court should make the determination in the first instance whether the record at this point supports summary judgment. *See Kverages v. Scottish Inns, Inc.,* 733 F.2d 409, 415–16 (6th Cir.1984). We find it necessary, therefore, to resolve whether we should adopt the per se no sale rule of *Security Tire.*

This Court has never been required to decide whether a per se standard should be adopted. There was no occasion to consider the proper standard in *Brewer,* and the discussion of the control standard in that case is dicta. In *Parrish* where the Court assumed that the company run stations were incorporated subsidiaries the Court needed only to decide whether the lower court's findings concerning control were sufficient to mandate judgment for defendants. In *Shavrnoch* the Court could have held that a transfer to an unincorporated company-owned station was not a "sale" since the purchaser was not a separate legal entity. In none of our earlier opinions did we directly address the question of whether a transfer to a wholly-owned subsidiary is never a sale for Robinson-Patman Act purposes. Since the lower court had in each of these three cases found that the control test was met, it was not necessary to go beyond a review of that finding.

 The per se rule of *Security Tire* has simply not been examined by our Court. We are not precluded from examining it now. The Supreme Court has repeatedly stated that in the antitrust area we apply an economic reality test. *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 208, 89 S.Ct. 361, 366, 21 L.Ed.2d 344 (1968). ("In interpreting the antitrust laws, we are not bound by formal conceptions of contract law. *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). We must look at the economic reality of the relevant transactions.") When we look at economic reality we must agree with the Fifth Circuit. The Robinson-Patman Act's prohibition of price discrimination extends to discrimination in other services. It is impossible for parent corporations to avoid giving special benefits to their subsidiaries. Here parent Marathon paid the salary of Emro's president. Parent corporations without exception pro-

---

**3.** We also do not consider dispositive the admission in an affidavit by a Marathon employee that "Marathon sells gasoline to Emro." Stub- bins affidavit, Supplemental Joint Appendix 59, 60.

vide capital for their subsidiaries. The price at which the product is transferred from parent to subsidiary may be only a small part of what is contributed by the parent to the subsidiary and to the subsidiary's ability to compete. Price, which within the parent's actual control, is only one factor in the complex relationship between parent and subsidiary.

The Court in its recent decision in *Copperweld Corp. v. Independence Tub Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), noted at 2743, "Antitrust liability should not depend on whether a corporate subunit is organized as an unincorporated division or a wholly owned subsidiary." Admittedly, the Court was dealing there with combinations or conspiracies between parent and subsidiary. However, the Court stated without qualification, that "a subsidiary acts for the benefit of the parent." 104 S.Ct. at 2743. Again, in footnote 18 the Court states:

> At least when a subsidiary is wholly owned, however, these factors ["separateness" of the subsidiary: whether it has separate control of its day-to-day operations, separate officers, separate corporate headquarters, and so forth] are not sufficient to describe a separate economic entity for purposes of the Sherman Act. The facts simply describe the manner in which the parent chooses to structure a subunit of itself. They cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary must be viewed as a single economic unit.

So here, the parent and subsidiary are a single economic unit. The Robinson-Patman Act is not concerned with transfers between them.

## V

The District Court correctly granted summary judgment for defendants on all claims. Accordingly, the judgment of the District Court is affirmed.

CORNELIA G. KENNEDY, Circuit Judge, dissenting.

The earlier decisions of our Court require that we follow the control test. The existence of possible alternative rationales does not change the fact that the control standard was a vital link in the logical scheme actually used by this Court to decide both *Parrish* and *Shavrnoch*. Where the legal principles applied by this Court in a prior case differ from those applied by another Circuit, the rule of *stare decisis* requires that we follow the principles previously applied by this Court. *Ashe v. Commissioner*, 288 F.2d 345, 347 (6th Cir.1961). "[I]t is the principle which controls and not the specific fact upon which the principle was decided." *Walker v. Georgia*, 417 F.2d 5, 8 (5th Cir.1969). A prior decision of this Court is controlling authority unless overruled by this Court sitting en banc or inconsistent with a decision of the United States Supreme Court. *See, e.g., Timmreck v. United States*, 577 F.2d 372, 376 n. 15 (6th Cir.1978), *rev'd on other grounds*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634, *on remand*, 600 F.2d 1228 (6th Cir.1979); *Hutchins v. Woodard*, 730 F.2d 953, 957 (4th Cir.), *stay vacated*, 464 U.S. 377, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984); *LeVick v. Skaggs Companies*, 701 F.2d 777, 778 (9th Cir.1983); *NLRB v. Datapoint Corp.*, 642 F.2d 123, 129 (5th Cir. 1981). Accordingly, unless the control test is inconsistent with a decision of the Supreme Court, we must hold that a parent corporation is incapable, for Robinson-Patman Act purposes, of effectuating a "sale" to its wholly-owned subsidiary corporation only if the control test of *Parrish* is satisfied.

In *Copperweld v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 2742, 81 L.Ed.2d 628 (1984), the Supreme Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." I do not believe that the Supreme Court's rationale in *Copperweld* requires the conclusion that a parent and subsidiary

are similarly a "single enterprise" for purposes of the Robinson-Patman Act.[1]

The Supreme Court's analysis in *Copperweld* was based on the Sherman Act's "basic distinction between concerted and independent action." 104 S.Ct. at 2740, *quoting Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). The Court's recognition of this crucial distinction permeates the reasoning which led the Court to reject the intra-enterprise conspiracy doctrine. The Court first contrasted § 2 of the Sherman Act, which governs single firm conduct but only when there is a threat of monopolization, with § 1, which does not require a threat of monopolization but regulates only concerted activity. The Court explained the reason for the difference between the two standards:

> Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction.

104 S.Ct. at 2741. The Court then reasoned that, although the language of § 1 is broad enough to cover coordinated conduct among officers of the same company, such combinations could not violate § 1 because: "The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." 104 S.Ct. at 2741. The Court then held:

For similar reasons, the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest.... If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

104 S.Ct. at 2742. The Court rejected the "single entity" test, which measured criteria such as separate control of day-to-day operations, separate officers, and separate headquarters, because that test was "inadequate to preserve the Sherman Act's distinction between unilateral and concerted conduct." 104 S.Ct. at 2742 n. 18.

Unlike § 1 of the Sherman Act, the proscriptions of § 2(a) of the Robinson-Patman Act are not limited to concerted activity. A single seller violates § 2(a) by charging one purchaser a higher price than that charged the purchaser's competitor. Although this requires the involvement of three parties, it is only the seller's conduct that violates § 2(a).[2] Although one purchaser is favored by the seller, that favoritism is not necessarily the result of any collusion between the seller and the favored purchaser; § 2(a) prohibits price discrimination motivated by non-collusive economic reasons, such as a desire to favor a purchaser possessing large quantity purchasing power. *See FTC v. Morton Salt Co.*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). Section 2(a) thus prohibits essentially unilateral conduct on the part of the seller. The competitive relationship between the purchasers is generally more important, for Robinson-Patman Act purposes, than the relationship between seller and purchaser. In *Perkins v. Standard Oil Co.*, 395 U.S.

---

1. The Supreme Court in *Copperweld* did not consider the applicability of its holding to the Robinson-Patman Act. The Fifth Circuit in *Security Tire & Rubber Co. v. Gates*, 598 F.2d 962, 965 (5th Cir.), *cert. denied*, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979), expressly distinguished "the rather remote question whether a partially-owned subsidiary corporation could conspire with its parent corporation in violation of the Sherman Act."

2. A purchaser may be held liable for violating § 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f), if it knowingly induces or receives an unlawful price discrimination.

642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969), the Supreme Court held that § 2(a) could be violated where the favored purchaser bought from the defendant seller through a chain of two intermediaries, since "[f]rom [the disfavored purchaser's] point of view, the competitive harm done him by [the seller] is certainly no less because of the presence of an additional link in this particular distribution chain from the producer to the retailer."

The Supreme Court's analysis in *Copperweld* cannot be applied to the Robinson-Patman Act. *Copperweld's* rationale is essentially that § 1 of the Sherman Act guards against the anticompetitive danger caused by the collusion of what were formerly two separate economic actors, and that a parent and its subsidiary could not present such a danger because they already had a "complete unity of interest." The Robinson-Patman Act, however, is not directed at the danger caused by the merging of separate interests. A price discrimination prohibited by § 2(a) is prohibited whether caused by collusion between seller and favored purchaser or by neutral economic factors. Section 2(a), like § 2 of the Sherman Act, prohibits certain conduct having anticompetitive effects even when undertaken unilaterally.

I therefore conclude that the *Parrish* control test is not inconsistent with the Supreme Court's decision in *Copperweld*. I would remand to the District Court for trial on the control test basis since I agree that the issue must be addressed in the first instance by the District Court.